**UNITED STATES of America**

v.

**Howard BIDLOFF, Kevin Bregman, and Russell Bronson, Defendants.**

**No. 97–CR–233A.**

United States District Court, W.D. New York.

Jan. 24, 2000.

United States Attorney, of counsel, Buffalo, NY, for United States.

LoTempio & Brown, Patrick J. Brown, of counsel, Buffalo, NY, for defendant Bidloff.

E. Carey Cantwell, Buffalo, NY, for defendant Bregman.

Angelo Musitano, Niagara Falls, NY, for defendant Bronson.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio pursuant to 28 U.S.C. § 636(b)(1), on March 30, 1998. Defendants Howard Bidloff, Kevin Bregman and Russell Bronson filed motions to dismiss the Indictment and to suppress the testimony of cooperating witnesses. Defendants Bidloff, Bregman and Bronson also filed motions for discovery and a bill of particulars, and the government filed a motion for reciprocal discovery. On May 12, 1999, Magistrate Judge Foschio filed a Report and Recommendation recommending that defendants' motions to dismiss the Indictment and to suppress the testimony of cooperating witnesses be denied. On that same date, Magistrate Judge Foschio also filed a Decision and Order, granting in part and denying in part defendants' motions for discovery, denying defendants' motions for a bill of particulars and making various other pretrial rulings.

Defendant Bronson objected to the Magistrate Judge's recommendation that the Court deny his motion to dismiss the Indictment. Additionally, defendants Bidloff and Bronson both objected to the Decision and Order which denied their motions for a bill of particulars and required that they provide reciprocal discovery within 60 days prior to trial.[1] Oral argument on the objections was held on December 17, 1999.

Denise E. O'Donnell, United States Attorney, Martin J. Littlefield, Assistant

---

1. Defendant Bregman did not file objections to either the Report and Recommendation or the Decision and Order.

## A. *Report and Recommendation*

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation. Accordingly, for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation, defendants' motions to dismiss the Indictment are denied.

## B. *Decision and Order*

With respect to defendants' objections to the Decision and Order, pursuant to 28 U.S.C. § 636(b)(1)(A), the district court "may reconsider any pretrial matter under this subparagraph (A), where it has been shown that the magistrate's order is clearly erroneous or contrary to law." *Id.* The Court has carefully reviewed the submissions of the parties and Magistrate Judge Foschio's Order, and having considered oral argument from counsel, the Court finds that the Order was neither clearly erroneous nor contrary to law. The Magistrate Judge did not err in denying defendants' motions for a bill of particulars. In any event, as for defendants' requests for disclosure of any "unnamed" co-conspirators, the government has represented that all witnesses who will testify at trial have been identified to the defendants. Accordingly, defendants' objections to Magistrate Judge Foschio's May 12, 1999 Decision and Order are denied.[2]

2. Defendants also objected to the Magistrate Judge's Decision and Order which required that the government disclose *Jencks* Act material fourteen days before trial. However, at oral argument, the government agreed to provide *Jencks* material three weeks prior to trial. Therefore, this objection is denied as moot.

The parties are ordered to appear before this Court on January 26, 2000 at 9:00 a.m. for a meeting to set a trial date.

IT IS SO ORDERED.

## REPORT and RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

This matter was referred to the undersigned for all pre-trial matters by Honorable Richard J. Arcara by order dated March 30, 1998. It is presently before the court on Defendants' motion to dismiss the Indictment and to suppress testimony of cooperating witnesses.

### BACKGROUND and FACTS

These Defendants were charged, together with 21 co-defendants, with conspiracy to commit wire and mail fraud in violation of 18 U.S.C. § 371 and §§ 1341, 1343. Specifically, Defendants are alleged to have engaged in the fraudulent sales of investments in germanium and indium,[1] metals used in various industrial applications.

The one count, 154 page, Indictment alleges fraudulent sales of germanium and indium at inflated prices through a series of telemarketing companies using mail drops in the United States, Canada, the Bahamas, and Dutch Antilles during the period 1990 to 1993. Indictment, Introduction; ¶¶ 1–5; 16. Defendant Bidloff is alleged to be an owner, with other co-defendants, of two of the sales companies used in the scheme and as a principal director of the scheme. *Id.,* ¶ 8. Defendant Bronson is alleged to have operated another sales company used in the scheme. *Id.,* ¶ 14. Defendants Bronson and Breg-

1. Germanium, a greyish white brittle mettaloid, resembles silicone and is used as a semiconductor. Merriam–Webster, Webster's Third New Int'l Dictionary 951 (1986). Indium is a silvery white highly fusible and malleable metal used as a coating on other metallic surfaces such as airplane engine bearings. *Id.,* 1152.

man are alleged to have acted as "openers", *i.e.*, salesmen who make an initial sale to a customer on behalf of the telemarketing companies using false and fraudulent pretenses and misrepresentations. *Id.*, ¶¶ 12; 13. Among the falsehoods used by Defendants, as found by the Grand Jury, were representations that there was an active speculators' market for the metals, the metals had a value much greater than in fact was case, prices for the metals were expected to enjoy imminent and significant increases because of technological advances and government stockpiling, the sales companies would buy back the customer's purchase at the customer's option, and that the salesman was not taking any commission on the initial sale. *Id.*, ¶ 16(A), (B), (C), (D), (E), (F). "Loaders" were experienced telemarketers who contacted a customer after the initial sale by an "opener" for the purpose of persuading the customer to increase his "investment" through additional misrepresentations and high-pressure sales tactics. *Id.*, ¶ 18. The false pretenses and misrepresentations were made from locations in Toronto, Ontario; Miami, Florida; Saba, Dutch Antilles; and Nassau, The Bahamas, and other locations within the United States. Indictment, ¶ 31. The Indictment alleges that the scheme successfully defrauded numerous persons within the United States of more than $10 million. *Id.*, ¶ 32.

The Indictment also alleges 1,376 overt acts in furtherance of the scheme. As relevant, Overt Act # 3, Indictment at 15, states that Defendant Bidloff met with other co-conspirators during March, 1993 to discuss a partnership arrangement with one of the sales companies operated as part of the scheme. Overt Acts 588 – 618, Indictment at 63–65, detail the names of persons to whom Defendant Bregman made fraudulent sales, the dates of such sales, and the amounts of such sales along with references to a Document Control Number which in turns refers to a DCN ("Document Control Number") Discovery List. A copy of the DCN Discovery List

("List") was provided to each Defendant by the Government as part of the Government's voluntary pretrial discovery obligation. Exhibit A, Government's Response to Defendants' Omnibus Motions, filed January 19, 1999 (Doc. # 99) ("Government's Response"). Using a Bates stamp numbering system, the List describes the evidence available to the Government to establish each sale attributed to a particular Defendant. For example, in the case of Defendant Bregman, the DCN No. 402 associated with his name states that the evidence consists of a witness and card files of the "target" company. List at 15. The Indictment also alleges that Bregman was an opener for the Columbia Metals Group of Toronto. Indictment ¶ 13, one of the companies alleged to be telemarketing companies involved in the scheme. Indictment, ¶ 1(a).

Overt Acts 619 – 685 detail fraudulent sales attributed, including names of customers and amounts of sales, to Defendant Bronson during the period July 21, 1992 through April 29, 1993 and relate each sale to evidence described under DCN No. 401. DCN No. 401 refers to card files of the "target" company. List at 15. The Indictment alleges that Bronson served as an opener for the Eurocan Metals Group of Toronto, one of the companies involved in the scheme. Indictment, ¶¶ 1(a); 12. The Government stated it has provided "open discovery of all the evidence," which Defendants do not dispute. Government's Response at 6. The DCN details similar information for each Defendant alleged to have participated in the scheme as an "opener" or as a "loader". In a Decision & Order filed contemporaneously with this Report and Recommendation, the court denied, in part and granted, in part Defendants' motions for discovery and a Bill of Particulars.

Oral argument was conducted February 25, 1999. Based on the following, Defendants' motions should be DENIED.

## DISCUSSION

1. *Motion to Dismiss.*

Defendants contend the Indictment is defective as it violates Fed.R.Crim.P. 7(c)(1). Specifically, Defendants argue the Indictment fails to state the specific false pretenses made by each Defendant and instead asserts only statutory language in conclusory form. Bronson Motion, ¶ 8. Defendants assert that such specificity is required in order to comply with Rule 7(c)(1) where mail fraud is charged. *Id.,* ¶ ¶ 9, 10.

Fed.R.Crim.P. 7(c)(1) requires an indictment be "a plain, concise and definite written statement of the essential facts constituting the offense charged." An indictment is constitutionally sufficient if it contains the elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and enables him to enter a plea without fear of double jeopardy. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *United States v. Hernandez,* 980 F.2d 868, 871 (2d Cir. 1992). Further, a federal indictment need only track the language of the statute and, if necessary, to appraise the defendant of the nature of the accusation against him, and state the time and place of the alleged offense in approximate terms. *See Russell v. United States,* 369 U.S. 749, 765, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *United States v. Covino,* 837 F.2d 65, 69 (2d Cir. 1988); *United States v. Bagaric,* 706 F.2d 42, 61 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983). Where an indictment tracks the statutory language it should nevertheless provide "facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Hamling, supra,* at 117–18, 94 S.Ct. 2887 (internal citation and quotation marks omitted).

An indictment for conspiracy to commit a federal offense need not allege the conspiracy with the same "technical precision" and "detail" as would be required in an indictment if the object offense had been charged. *Wong Tai v. United States,* 273 U.S. 77, 81, 47 S.Ct. 300, 71 L.Ed. 545 (1927) (indictment for conspiracy to violate Opium Act sustained where charge provided reasonable particularity as to time, place, identity of co-conspirators, object crime, and overt acts); *United States v. Wydermyer,* 51 F.3d 319, 326 (2d Cir.1995) (indictment for conspiracy to make false statement upheld despite failure to state exact nature of alleged falsehood as the company's objective). Where the indictment alleges a conspiracy to commit mail fraud, the indictment is sufficient if the allegation of the scheme to defraud provides sufficient details as to the fraudulent nature of the scheme without alleging specifics of the fraudulent misrepresentation. *Id.* (indictment sufficiently informed defendant of the object offense of the conspiracy); *United States v. Gordon,* 780 F.2d 1165, 1170–72 (5th Cir.1986) (conspiracy to commit mail fraud indictment sustained despite failure to allege false pretense where falsity apparent from the description of alleged scheme to defraud and overt act). The "rationale" for this distinction is that "the crime of conspiracy is complete whether or not the substantive offense which was its object was completed." *Wydermyer, supra,* at 325.

In this case, the Indictment charges a conspiracy in violation of 18 U.S.C. § 371 to commit mail and wire fraud prohibited by 18 U.S.C. §§ 1343, 1341. As relevant, 18 U.S.C. § 371 is violated when two or more persons conspire to commit any offense against the United States. The offense of mail fraud occurs when money is obtained by means of false pretenses or representations as a result of a scheme to defraud involving use of the mail. 18 U.S.C. § 1341. Wire fraud occurs when such fraud involves use of a wire, *e.g.,* telephone, communication. 18 U.S.C. § 1343. A conspiracy charge requires establishing an agreement between the defendant and at least one other per-

son to commit an offense; that the defendant knowingly participated in the conspiracy with the specific intent to commit the illegal object of the conspiracy; and that during the conspiracy an overt act in furtherance of the illegal objective was committed by a member of the conspiracy. *United States v. Salameh, supra,* 152 F.3d 88, 145–46 (2d Cir.1998). The Indictment plainly alleges two or more persons, including Defendants Bidloff, Bregman, and Bronson, agreed to commit mail and wire fraud. It describes an elaborate telemarketing scheme based on several material misrepresentations of fact in the sale of germanium and indium, particularly grossly inflated values of these industrial metals. Additionally, numerous overt acts describing specific actions taken by co-conspirators in furtherance of the conspiracy and the identity of the defrauded persons, the amount and date of their respective losses are also alleged. The Indictment tracks the language of the conspiracy statute and provides specific details regarding the elements and factual circumstances of the offense. As such, the Indictment satisfies Fed.R.Crim.P. 7(c)(1) and the requirements of the Sixth Amendment.

Nor is the Indictment defective because it fails to specifically provide details concerning particular misrepresentations attributable to Defendants, even if specification of the false pretenses or misrepresentations were required, as Defendants assert, for a valid conspiracy charge where mail or wire fraud was the object offense. As noted, Defendants Bregman and Bronson are alleged to have acted as salesmen, "openers," for two of the telemarketing companies involved in the scheme. Indictment, ¶ ¶ 12, 13. Such "openers" are specifically alleged to have defrauded identified customers of the amounts of money as detailed in the overt acts by misrepresenting that such "opener" was not taking a commission on the sale and would receive his compensation when the opener's company "bought back the metal."

Indictment, ¶ 16(F). Further, the Indictment alleges that "openers" who worked for the telemarketing sales companies Columbia (Defendant Bregman) and Eurocan (Defendant Bronson) made sales using other misrepresentations "similar" to those alleged in subparagraph 16(A), (B), (C), (D), (E), (G), and (H) of the Indictment. Therefore, it is incorrect to claim that the Indictment fails to provide any specifics as to the nature and circumstances of the false representations of which Defendants are charged.

The cases relied on by Defendants, Bronson Motion, ¶ ¶ 9, 10, are inapposite. In *United States v. Yefsky, supra,* 994 F.2d 885 (1st Cir.1993), the indictment charged conspiracy to commit mail fraud and several counts of mail fraud. Sustaining the defendant's conspiracy conviction, the court found harmless error in the failure of the conspiracy count to describe the fraudulent nature of the alleged scheme to defraud which was the object of the conspiracy. *Yefsky, supra,* at 893. While the indictment provided several facts, the court also found it nevertheless failed to "describe [defendant's] fraudulent conduct." *Id.* The court specifically faulted the indictment's failure to provide notice of the underlying fraud where the substantive mail fraud counts, not attacked by defendant for facial deficiency, alleged different fraudulent conduct which did not "flow" from the conspiracy. *Id.* Holding that where an indictment for conspiracy to commit mail fraud depends "so crucially" on an underlying fraud, such fraud must be specified in the conspiracy count, the court emphasized that the alleged fraud in the conspiracy count was factually different from that alleged in the substantive mail fraud counts. *Id.* Had the indictment alleged that the substantive mail fraud counts were the objects of the challenged conspiracy counts, the court stated it would make "sense" to read the indictment "as a whole." *Id.*

Here, the Indictment amply describes the fraudulent scheme constituting the purpose of the conspiracy as well as the means by which the conspiracy was implemented. Thus, *Yefsky* provides no support for Defendants' contention that the instant Indictment is defective because it fails to state specific false pretenses against each Defendant. Nor does *Yefsky* hold that in every case an indictment for conspiracy to commit mail or wire fraud must describe with particularity the precise nature of any fraudulent misrepresentations upon which an uncharged mail or wire fraud offense would be based. *United States v. Nance,* 533 F.2d 699 (D.C.Cir.1976) (indictment failed to state false representations) *(per curiam* ) and *United States v. Curtis,* 506 F.2d 985, 988 (10th Cir.1974) (nature of scheme to defraud and false pretenses "left to speculation"), also cited by Defendants, involve only substantive mail fraud counts where the respective indictments did not sufficiently allege the false representations upon which such charges were founded. As neither case involved a conspiracy count, they are also inapposite to the issue presented. Defendants' motion to dismiss the Indictment should therefore be DENIED.

2. *Preclusion of Cooperating Witness Testimony.*

▮ Defendants request the court preclude testimony of any prospective Government witness who may have entered a guilty plea. Defendants contend such preclusion is required pursuant to 18 U.S.C. § 201(c)(2) which prohibits offering value in return for testimony. See *United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998) (*"Singleton I "*), vacated en banc, 144 F.3d 1343 (10th Cir.1998). The Tenth Circuit recently rejected *Singleton I* in a *en banc* decision. *United States v. Singleton,* 165 F.3d 1297 (10th Cir.1999) (*"Singleton II"*); *certiorari denied,* —— U.S. ——, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999).

Defendants rely on the panel decision issued in *Singleton I* as well as later decisions following it notwithstanding their present lack of precedential value. *See, e.g., United States v. Lowery,* 15 F.Supp.2d 1348 (S.D.Fla.1998), *reversed,* 166 F.3d 1119 (11th Cir.1999). Specifically, based on the reasoning of *Singleton I,* Defendants contend that should the Government offer testimony from a witness where the giving of such testimony is an explicit condition of a plea agreement with the Government under which the Government agrees to extend favorable treatment either in the form of permitting a plea to a reduced charge or an understanding whereby the Government commits itself to make a motion for downward departure under the Sentencing Guidelines in return for the witness's cooperation in the giving of such testimony, the Government's agreement constitutes a violation of 18 U.S.C. § 201(c)(2) (" § 201(c)(2)" or "the statute"), thereby requiring the court to suppress such testimony as illegally obtained evidence. The contention is without merit.

At present, nearly all courts which have considered the issue raised in *Singleton I* disagree with its holding. *United States v. Johnson,* 169 F.3d 1092 (8th Cir.1999); *Singleton II, supra; United States v. Ramsey,* 165 F.3d 980 (D.C.Cir.1999); *United States v. Lowery,* 166 F.3d 1119 (11th Cir.1999); *United States v. Haese,* 162 F.3d 359 (5th Cir.1998); *United States v. Ware,* 161 F.3d 414 (6th Cir.1998) (citing cases). The Second Circuit has not addressed the issue; however, to date, no district court within this circuit has agreed with *Singleton I. See, e.g., United States v. Jennings* 1998 WL 865617 (N.D.N.Y. Dec. 8, 1998); *Cancel–Hernandez v. United States,* 1998 WL 846824 (E.D.N.Y.1998); *United States v. Szur,* 1998 WL 661484 (S.D.N.Y. Sept.24, 1998); *United States v. Nieves,* 1998 WL 740835 (D.Conn. Oct 13, 1998).

▮ As noted, § 201(c)(2) imposes criminal penalties on "whoever" directly or

indirectly gives, offers or promises anything of value in return for sworn testimony. However, it is well established that when the personal pronoun whoever appears in a federal statute it should not be understood to refer to the government unless the statute expressly so provides. *Nardone v. United States,* 302 U.S. 379, 383, 58 S.Ct. 275, 82 L.Ed. 314 (1937); *United States v. Herron,* 87 U.S. (20 Wall.) 251, 255, 22 L.Ed. 275 (1873). Moreover, the word "person" when used in a statute does not include the United States. *See United States v. United Mine Workers of America,* 330 U.S. 258, 275, 67 S.Ct. 677, 91 L.Ed. 884 (1947). *See also* 1 U.S.C. § 1 ("persons" and "whoever" when used in federal statutes include typical private business entities and individuals). Further, if inclusion of government agents would deprive the sovereign of a "prerogative title or intent," or would result in an "obvious absurdity," such agents are not included in the statutory pronoun. *Nardone, supra,* at 382–84, 58 S.Ct. 275; *Ware, supra,* at 419.

In *Singleton I,* the court applied these canons of construction but, nevertheless, held that applying § 201(c)(2) to agents of the Government did not interfere with the rights or prerogatives of the United States nor did it lead to an absurd result. *Singleton I, supra,* at 1335, 1348. *Singleton I* relied on *United States v. Arizona,* 295 U.S. 174, 184, 55 S.Ct. 666, 79 L.Ed. 1371 (1935), which held the Secretary of Interior was within Congress' prohibitions on "any person" from constructing a dam across navigable waters without Congress' approval. *Arizona* is, however, distinguishable as there the legislation regulated a specific activity which may directly impair Congress' plenary legislative authority over regulating navigable waters within the United States whereas the issue here is congressional intent in regulating activity related to the day-to-day enforcement of federal criminal laws where Congress has historically acknowledged the exclusive power of the President, acting through duly appointed United States attorneys, to

prosecute violations of those laws. Therefore, before interpreting § 201(c)(2) to apply to these agents of the Government, a sound reason must be shown to justify a finding that Congress intended to criminalize the traditional discretion of such attorneys to offer inducements in return for testimony, contrary to accepted experience both before and after enactment of § 201(c)(2). Unless such reason exists, application of the statute to its agents deprives the government of a established prerogative and interest relating to the exclusive authority of the President to execute federal criminal laws and leads to absurd results.

In The Whiskey Cases (*United States v. Ford,* 99 U.S. 594, 9 Otto 594, 25 L.Ed. 399 (1878)), the Supreme Court recognized the common law "doctrine of approvement" permitting a capital defendant to offer testimony against an accomplice in return for a potential pardon. *Id.,* at 599–600, 9 Otto 594. More than 80 years later, and four years after the most recent revision of § 201(c)(2), the Supreme Court in *Hoffa v. United States,* 385 U.S. 293, 310–12, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), confirmed the accepted practice in this country of using informant testimony against an accused. In *Hoffa,* the Court rejected the contention that such testimony offended traditional notions as to the proper administration of justice in the nation's courts. *Hoffa, supra,* at 312, 87 S.Ct. 408. While acknowledging that such witnesses may have a motive to lie, the Court stated that "it does not follow" that the informant's testimony is either untrue or constitutionally inadmissible, rather, "[t]he established safeguards of the Anglo–American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." *Id. See also Lisenba v. California,* 314 U.S. 219, 227, 62 S.Ct. 280, 86 L.Ed. 166 (1941) ("practice of taking into consideration, in sentencing an accomplice, his aid to the state in turning state's

evidence can be no denial of due process to a convicted confederate."); *Benson v. United States*, 146 U.S. 325, 333–37, 13 S.Ct. 60, 36 L.Ed. 991 (1892) ("[a]n accomplice is a competent witness for the prosecution, although his expectation of pardon depends upon the defendant's conviction."); *United States v. Cervantes–Pacheco*, 826 F.2d 310, 315 (5th Cir.1987), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988) ("[n]o practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify under a plea bargain that promises him a reduced sentence.")

An accepted rule of statutory construction is that Congress is presumed to know the state of federal law against which it legislates. *Cannon v. University of Chicago*, 441 U.S. 677, 696–97, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) ("It is always presumed that our elected officials, like other citizens, know the law."). Given the prevailing judicial authority in existence both in 1948, when the first version of § 201(c)(2) was enacted and, in 1962, when the current text of § 201(c)(2) was adopted, it is implausible that Congress intended to effectively wipe out a practice as old as the Republic itself. This conclusion is especially reasonable when the legislative history of § 201(c)(2) is reviewed. A reviser's note to the 1948 enactment stated that Congress enacted the new statute to "mak[e] it unlawful to offer to bribe a witness" without any indication the law was intended to cover prosecutors who extend lenient treatment in return for testimony. 18 U.S.C. § 209 (1946 & Supp. 1948) (Reviser's Note, 1948) (current version at 18 U.S.C. § 201(c)(2)). Further, in 1962, when the statute was revised to include testimony given before Congress, its committees, and federal agencies and commissions, there was no indication that the statute's prohibitions extended to plea bargaining by federal prosecutors. S.Rep. No. 2213, 87th Cong., 2d Sess. (1962), reprinted in 1962 U.S.C.C.A.N. 3852, 3853 (legislation "would make no significant changes of substance."). It is true, as the court in *Singleton I* noted, the House Report on the 1962 legislation states the conduct to be outlawed has "the appearance of evil and the capacity of serving as a cover for evil." *Singleton I, supra*, at 1352 (quoting H.R.Rep. No. 87–748, 87th Cong., 2d Sess. (1961) at 16). However, in light of the prior rulings of the Supreme Court approving the practice of granting leniency in return for testimony, it is unlikely that the author of the Report had, in the absence evidence to the contrary, any reason to view such longstanding practice as an "evil" to which the statute was directed.

Developments in federal caselaw and congressional initiatives since 1962 reinforce the finding that § 201(c)(2) has no application to a government attorney in agreeing to provide leniency in return for testimony. In 1971, the Supreme Court upheld the enforceability of plea agreements stating

The disposition of criminal charges by agreement between the prosecutor and the accused, sometimes loosely called "plea bargaining," is an essential component of the administration of justice. Properly administered, it is to be encouraged.

*Santobello v. New York*, 404 U.S. 257, 260, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).

In 1966, 1974 and 1975, Fed.R.Crim.P. 11 was amended to clarify the procedures required for the taking of guilty pleas in federal court and enlarge the disclosures of all terms of understanding between a defendant and the Government relating to a proposed plea. The 1974 and the 1975 amendments recognized that plea agreements may include obligations upon the defendant to cooperate in prosecuting others, including giving testimony. *See* Advisory Committee Notes to 1974 Amendments to Fed.R.Crim.P. 11 ("Finally, a plea agreement may also contribute to the successful prosecution of other more seri-

ous offenders."); Advisory Committee Notes to 1975 Amendments to Fed. R.Crim.P. 11(e) ("It is apparent ... that Rule 11(e) contemplates that the plea agreement may bind the defendant to do more than just plead guilty ... [f]or example, it may bind the defendant to cooperate with the prosecution in a different investigation."). Significantly, the revisers failed to exclude giving testimony favorable to the prosecution—the most obvious and potentially important form of such cooperation—from the cooperation for which they intended Rule 11 to pertain because it was thought clearly prohibited by § 201(c)(2). The notion that § 201(c)(2) applied to government attorneys also escaped the attention of the Supreme Court. In *United States v. Mezzanatto*, 513 U.S. 196, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995), the Court recognized that in the course of plea bargaining federal prosecutors frequently must decide "whether to extend leniency or full immunity to some suspects in order to procure testimony against other, more dangerous suspects." *Mezzanatto, supra*, at 207, 115 S.Ct. 797. Application of § 201(c)(2) to such arrangements would render the Court's observation an irrelevancy.

Even more pertinent, in the Sentencing Reform Act of 1984, Congress provided for sentencing considerations based specifically upon a defendant's cooperation. 18 U.S.C. § 3553(e) (sentence to be based on guidelines established by Sentencing Commission); 28 U.S.C. § 944(a) (in establishing guidelines Sentencing Commission to "take into account a defendant's substantial assistance in the investigation or prosecution of another person"); 28 U.S.C. § 944(n) (court to impose sentence below guideline minimum based on defendant's "substantial cooperation"); USSG § 5K1.1(a)(2) (upon government's motion court may give downward departure from guideline minimum sentence based on assessment of "truthfulness, completeness, and reliability of any information or testimony provided by the defendant"). To suggest that a government prosecutor who enters into a plea agreement requiring a cooperating defendant to provide testimony in return for plea and sentencing considerations as authorized by Congress thereby engages in criminal activity produces a bizarre result. To further suggest, as *Singleton I* does, *Singleton I, supra*, at 1354, that § 5K benefits need not be conditioned upon giving testimony is contrary to the interests and expectations of the parties.

Neither prosecutor nor defendant have any interest in an arrangement which is completely unenforceable and if the expectation of the parties concerning a defendant's anticipated cooperation, including testimony, is not disclosed as part of the Rule 11 proceeding, that risk necessarily arises. The reality is that no defendant would volunteer to testify favorably to the government without such an enforceable agreement, even if subject to the government's reservations that, in the government's view, the testimony be truthful. The presence of a formal understanding on the record or an informal expectation off the record does not affect the likelihood the testimony will be more truthful or untruthful. It cannot, accordingly, be reasonably inferred that Congress, in the 1984 Sentencing Reform Act, encouraged federal prosecutors and defendants to agree on leniency in return for testimony expecting that such agreements would be thereby rendered criminal conduct under § 201(c)(2). Congress therefore did not intend a result which benefits neither defendant nor prosecutor.

*Singleton I's* expressed fear that testimony bartered for leniency or other consideration must be prohibited to "prevent fraud upon the federal courts in the form of inherently unreliable testimony," *Singleton I, supra*, at 1346, is groundless. First, it is well settled that matters of credibility are for a properly instructed jury. *Hoffa v. U.S., supra*, at 312, 87 S.Ct. 408. Secondly, *Singleton I's* reliance, *Singleton I, supra*, at 1346, upon *Nardone, supra*, for

this sweeping proposition, is misplaced. The Court's determination in *Nardone* that section 605 of the Communications Act of 1934, outlawing non-consensual wiretapping, included federal agents was indisputably influenced by the acknowledged public controversy concerning the propriety of that investigative tool. "For many years controversy has raged with respect to the morality of the practice of wire-tapping by officers to obtain evidence. It has been the view of many that the practice involves a grave moral wrong." *Nardone, supra,* at 383, 58 S.Ct. 275. Whatever the basis for that moral controversy in 1937 there is simply no indication the Court believed that among them was the notion that the resulting testimony was "inherently unreliable." Moreover, based on Congress' and the Supreme Court's record of approval of the practice of plea bargaining, there is no reason to believe that in its 1948 or 1962 legislation enacting and revising § 201(c)(2) Congress was actuated by similar moral controversies over the practice of trading testimony for leniency by federal prosecutors. While plea bargaining continues to be a subject of fair public debate, the fact is that in both judicial decisions and congressional legislation, the practice, like wiretapping, has been sanctioned and, indeed, for better or for worse, institutionalized. *Singleton I's* assertion that because the statute seeks to "prevent fraud, injury or wrong," *Singleton I,* at 1346, it therefore applies to government prosecutors finds no support in *Nardone.*

Further, the proposition that testimony which is the product of a plea agreement is "inherently unreliable" is without factual foundation. First, *Singleton I* cited to no empirical evidence to support this assertion. Second, although it is possible that judges may be able, by experience and training, to better assess credibility than juries in some cases, nevertheless, this court's research reveals no published decision in which a federal court has granted a motion for a verdict of acquittal, under Fed.R.Crim.P. 29, or a new trial, pursuant to Fed.R.Crim.P. 33, based on a finding that a cooperating witness' testimony was "inherently unreliable" and thus worked a "fraud" on the court. To the contrary, when confronted with such issues, courts have consistently held the issue of the witness' supposed untruthful testimony is for the jury and denied the request. *See, e.g., United States v. Medina–Rojas,* 112 F.3d 506 (2d Cir.1996) (table) (upholding district court's denial of motion for new trial under Fed.R.Crim.P. 33 on the basis that cooperating witness gave inconsistent testimony which may constitute perjury as much of testimony was corroborated by other trial evidence and jury could consider any inconsistencies in the testimony in assessing the weight and credibility of such evidence), *cert. denied,* 519 U.S. 1138, 117 S.Ct. 1009, 136 L.Ed.2d 887 (1997); *United States v. Wong,* 78 F.3d 73, 80–81 (2d Cir.1996) (new trial not warranted based on newly discovered evidence showing that co-defendant received undisclosed consideration for testifying against defendant where such evidence was cumulative of impeachment evidence presented at trial as to testifying co-defendant's interest and bias including written leniency agreement); *United States v. Chambers,* 944 F.2d 1253, 1263 (6th Cir.1991) (upholding district court's denial of motion for new trial based on government informant's recantation of inculpatory trial testimony as trial court determined that such recantation was not credible and convicting jury had ample opportunity to observe witness' demeanor and assess credibility at trial); *United States v. Brown,* 602 F.2d 1073, 1077–78 (2d Cir.1979) (upholding district court's decision insofar as it denied motion for directed verdict of acquittal under Fed.R.Crim.P. 29 on the basis that suspicious trial testimony by paid informant did not raise reasonable doubt requiring an acquittal where sufficient facts in evidence supported reasonable juror's guilty verdict). Thus, the failure of trial courts to detect and remedy the unreliable testimony to which, according to *Singleton I,* they are,

through plea agreements, routinely exposed is inconsistent with *Singleton I's* unsupported theory on the untruthfulness of cooperating witnesses. The reported experience, as noted, of federal trial courts and common sense dictate otherwise.

Bartered testimony, like most other evidence is not presented in a vacuum. It is a rare case where the factual evidence of a defendant's criminality depends solely on the testimony of the cooperating witness. As informed juries will expect other corroborating elements, such evidence is typically provided. There is no objective reason why such witnesses should be inclined to lie to suit the government, regardless of whether there is an agreement for their testimony. Where an agreement exists, testimony substantially at odds with other evidence known to the government regardless of admissibility, runs the risk that the witness will lose the benefits contemplated by the agreement in addition to a perjury charge. In either event, the witness is subject to perjury. The incentive to be truthful may thus be enhanced, not necessarily reduced, by the existence of the witness' agreement with the government. *See United States v. Borello,* 766 F.2d 46, 56–57 (2d Cir.1985) (recognizing that informing the jury that testifying witness has agreed to cooperate with the government is "a double-edged sword" as the existence of such agreement may suggest either that the witness will testify in accordance with the government's wishes, regardless of the truth, or that the witness will not lie under threat of revocation of the agreement should the witness commit perjury) (citing cases). It is common knowledge that perjury can occur regardless of any agreement with the government. Even if it were conceded that some incentive to exaggerate or shade the facts is created by the benefits sought by the agreement, the court fails to see how that possibility is removed by the absence of a formal agreement spelling out specific benefits in the event a conviction results from purely voluntary testimony by an accomplice turned government witness.

Additionally, *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) require the defendant be notified of the existence of such agreements thereby assuring that any resulting potential for exaggeration or nuanced testimony will be fully assessed by the jury. *See also* Fed. R.Evid. 601 ("[e]very person is competent to be a witness."); *United States v. Murphy,* 41 U.S. (16 Pet.) 203, 211, 10 L.Ed. 937(1842) (a person "receiv[ing] a reward for or upon the conviction of the offender" ... "universally recognized as a competent witness."). As noted, the "evil" to which § 201(c)(2) was more likely directed was the covert, not the public, agreement for testimony. In sum, there is no basis to believe that the administration of justice is seriously impaired by the solicitation and admission of testimony pursuant to an agreement with government attorneys.

The impact of sustaining *Singleton I's* interpretation of the statute upon the operation of significant congressional enactments directly affecting the enforcement of federal criminal laws also cannot be ignored. First, unless a specific exemption were created by Congress, the government's use of the immunity statute, 18 U.S.C. § 6001, *et seq.,* would be placed under a cloud as the conferral of immunity by a government attorney may well, under *Singleton I,* be considered a form of inducement in return for testimony prohibited by § 201(c)(2). *Singleton I's* distinction to avoid such a untoward result, *i.e.,* that the conferral of immunity is an action taken by the court, not the government attorney, *Singleton I, supra,* at 1347, is of dubious validity. It is not necessary to agree with the recent characterization of such distinction as "a fine bit of sophistry," *United States v. Ware, supra,* at 422, to hold the distinction to be one without a difference. Second, applying the statute as would *Singleton I* to other forms of standard inducements to cooperate is like-

ly to limit the usefulness of the Witness Relocation and Protection Act, 18 U.S.C. § 3521, *et seq.*, first enacted in 1984, which specifically contemplates granting such benefits in return for testimony. 18 U.S.C. § 3521(d)(1)(A) (requiring as a condition to granting protection under the Act the "agreement" of the person to receive protection to testify in . . . all appropriate proceedings). Third, the effectiveness of the federal reward statutes would be severely diluted if the government could not condition reward offers upon the giving of testimony in cases covered by these statutes. *See* 18 U.S.C. § 3058 (information leading to arrest of person charged with federal and state crimes); 18 U.S.C. § 3059A (information relating to financial institution fraud); 18 U.S.C. § 3059B (general assistance to Department of Justice "in performing its functions."); 18 U.S.C. § 3071(a) (information leading to arrest and conviction of persons committing terrorism against United States persons or property); 19 U.S.C. § 1619 (customs laws); 26 U.S.C. § 7623 (tax laws); 28 U.S.C. § 524(c)(1)(C) (forfeiture). The latter three statutes have been interpreted to permit rewards based upon giving testimony. *See, e.g., Murphy, supra,* 41 U.S. at 210–11, 16 Pet. 203 (forfeiture); *United States v. Cuellar,* 96 F.3d 1179, 1182–83 (9th Cir.1996) (customs laws), *cert. denied,* 520 U.S. 1109, 117 S.Ct. 1117, 137 L.Ed.2d 318 (1997); *United States v. Wilson,* 904 F.2d 656, 660 (11th Cir.1990), *cert. denied,* 502 U.S. 889, 112 S.Ct. 250, 116 L.Ed.2d 205 (1991) (tax laws). Thus, if the reward offers extended in connection with past or future investigations involving serious domestic and foreign threats had been or were to be conditioned upon giving of testimony, such testimony would, under *Singleton I,* be inadmissible.

Some of these authorizations of self-evident value were enacted well before § 201(c)(2), several well-after; in any event, it is difficult to accept the proposition that Congress also expected to simultaneously limit, in significant part, the benefits of such important enactments for the public safety through the application of § 201(c)(2). As the court itself in *Singleton I* noted, a basic duty of courts is " 'reconciling many laws enacted over time, and getting them to "make sense" in combination.' " *Singleton I, supra,* at 1347 (quoting *United States v. Fausto,* 484 U.S. 439, 453, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988)). Further, in "implementing what statutory analysis requires, congressional policy as reflected in enacted statutes must ultimately be the guide." *Heck v. Humphrey,* 512 U.S. 477, 503, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (Souter, J. concurring). As the foregoing discussion illustrates, the reasoning in *Singleton I* fails to sensibly reconcile § 201(c)(2) with the operation of several statutes of broad significance to the administration of federal criminal justice, and the *Singleton I* court's finding that § 201(c)(2) prohibits admission of testimony obtained by government attorneys in return for leniency is contrary to congressional policy as reflected in these statutes.

There is, moreover, no merit in the argument, accepted by *Singleton I,* that the absence in § 201(c)(2) of the exception provided in § 201(c)(1) prohibiting gratuities to public officials for performance of official acts, except where "otherwise than an provided by law," indicates Congress intended to extend § 201(c)(2), which has no similar exception, to government attorneys. *See Singleton I, supra,* at 1349. Section 201(c)(1) does not regulate the obtaining of testimony in judicial proceedings and the purpose of the exclusion was to assure the continued legality of campaign contributions to members of Congress. *See United States v. Brewster,* 506 F.2d 62, 73 n. 26 (D.C.Cir.1974). Thus, the absence of an "otherwise than as provided by law" exception in § 201(c)(2) is irrelevant to the question whether that subsection was intended to prohibit testimony in return for any gratuity of value.

Nor does it follow that, as posited by *Singleton I,* because 18 U.S.C. § 201(b)(3),

directed to bribery, requires that a payment to influence testimony be with a corrupt motive, the absence of such requirement in § 201(c)(2), directed to gratuities, supports its conclusion. *Singleton I, supra*, at 1350–51. All persons, including government agents, are prohibited from bribing witnesses. However, government attorneys who obtain testimony for leniency act within their authority and the fact that they may be subject to § 201(b)(3) does not imply they are thereby subject to § 201(c)(2); if anything, the absence of a corrupt purpose element in the statute implies they are not.

When the threshold question of the proper interpretation of the term "whoever" in § 201(c)(2) is considered against this background, there is little doubt that to include a government attorney within its purview "would deprive the sovereign of an established title or interest," and "work an absurd result," *Nardone, supra*, at 382, 384, 58 S.Ct. 275 and, therefore, such attorneys are not within its scope. The foregoing discussion demonstrates such inclusion would result in significant impairment of the government's ability to conduct the public's business through the effective enforcement of federal criminal laws which must be considered before reaching a sound determination of the proper meaning of the term. *See Herron, supra*, at 258, 20 Wall. 251 (rejecting inclusion of the United States in a statute's coverage where to do so would result in "a constant and irremediable source of public inconvenience and embarrassment.").

 Alternatively, should the district judge choose to hold § 201(c)(2) applicable to the testimony challenged by the instant motions, suppression is, nevertheless, not required. The exclusionary rule is reserved for serious constitutional violations, and should not be applied to other violations of federal statutes which do not involve related constitutional interests particularly where, as here, Congress has enacted a specific remedy. *United States v. Ware, supra*, at 424.

Nor can Defendants seek relief based on any alleged violation of the New York Code of Professional Responsibility ("Code"), specifically, DR–7–109 and EC 7–28. The Code is applicable to attorneys practicing in this court. Local R.Civ.P. 83.3 (W.D.N.Y.). As relevant, DR–7–109 states that "[a] lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his or her testimony or the outcome of the case." EC 7–28 refers only to "financial inducements." Code of Professional Responsibility DR–7–109; ED 7–28, N.Y. Judiciary Law Appendix (McKinney 1992). However, as they are by their own terms limited to payment of compensation in return for testimony, neither ethical provision is applicable to testimony resulting from an agreement between a government attorney and a witness involving, as here, an offer or expectation of prosecutorial leniency. Defendants' motions are directed to an agreement to testify based on plea bargaining, not cash. Accordingly, there is no basis for suppression on this ground. Further, state professional disciplinary codes even if applicable to federal prosecutors cannot supersede federal rules governing admissibility of evidence in federal criminal cases. *United States v. Lowery*, 166 F.3d 1119, 1124 (11th Cir.1999) (rejecting use of Florida state bar rule of professional conduct as basis to restrict admissibility of cooperating testimony and holding P.L. No. 105–227, § 801(a) (subjecting federal attorneys to state rules of professional ethics) does not apply).

In sum, Defendants' reliance upon *Singleton I* and the Code demonstrates that their motions to suppress on these grounds are without merit. *Singleton I's* holding is contrary to accepted canons of statutory construction, irreconcilable with longstanding principles of evidence in the federal courts, and impairs the effectiveness of specific congressional enactments. Although well-written, the *Singleton I* opinion is, moreover, simply unpersuasive.

However laudable may be the *Singleton I* court's premise, that it should be improper for federal courts to admit testimony bartered by government attorneys in return for leniency or even economic benefits, such issue requires the balancing of numerous factors, a task best reserved to Congress.

## CONCLUSION

Based on the foregoing, Defendants' motions should be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Government and the Defendants.

SO ORDERED.

May 12, 1999.