**UNITED STATES of America,**

v.

**Walter FANTIN, Defendant.**

No. 97–CR–0233A.

United States District Court,
W.D. New York.

Nov. 15, 2000.

Denise E. O'Donnell, United States Attorney, Martin J. Littlefield, Assistant United States Attorney, of Counsel, Buffalo, NY, for the United States.

Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, Paul J. Cambria, Jr., Herbert L. Greenman, and Michael P. Sturmer, of Counsel, Buffalo, NY, for Defendant.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio pursuant to 28 U.S.C. § 636(b)(1), on March 30, 1998. On February 22, 2000, defendant filed a motion to dismiss the indictment and to suppress evidence, or in the alternative, for an evidentiary hearing. On June 19, 2000, Magistrate Judge Foschio filed a Report and Recommendation, recommending that defendant's motion be denied. Defendant filed objections to the Magistrate Judge's Report and Recommendation on July 19, 2000, and the government filed a response thereto on August 8, 2000. Defendant filed a Supplemental Memorandum in support of his objections on October 13, 2000, and the government filed an affidavit in response thereto on October 18, 2000. Oral argument on the objections was held on October 18, 2000.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation. The Court finds unpersuasive defendant's argument that he should be afforded an evidentiary hearing. Defendant basically seeks such a hearing on two issues: (1) on the extent of defendant's contacts with this Country for purposes of asserting the protections of the Fourth Amendment; and (2) on whether Canadian authorities were acting as agents of the Federal Bureau of Investigation ("FBI") when they conducted the disputed searches. With regard to the first issue, an evidentiary hearing is not needed as this information is already in defendant's possession. The defendant should obviously be fully aware of his own contacts with the United States and has presented evidence in that regard. The Magistrate found, and this Court agrees, that under the test in *United States v. Verdugo–Urquidez,* 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), defendant's contacts with the United States were insufficient for purposes of allowing him to invoke the protections of the Fourth Amendment. Because the Fourth Amendment does not apply to the disputed searches in this case, the Court need not reach the issue of whether Canadian authorities were acting as agents of the FBI at the time of those searches. Even if the Court were to reach that issue, however, defendant still would not be entitled to an evidentiary hearing based on the facts and circumstances present here. Although there was contact between the FBI and Canadian authorities prior to the disputed searches, defendant has come forth with no evidence indicating that the Canadian authorities were somehow being controlled or manipulated by the FBI. There is not even a threshold

showing to that effect. In fact, all the evidence in the record indicates that the Canadian investigation of defendant was commenced independently prior to any involvement by the FBI. An evidentiary hearing at this point would simply be a fishing expedition.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation and herein, defendant's motion to dismiss and to suppress evidence, or alternatively, for an evidentiary hearing is denied. The Clerk of Court shall mail a copy of this Order to counsel for all parties in this case. All counsel shall appear before the Court on November 17, 2000 at 9:00 a.m. for a meeting to set a trial date.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

This matter was referred to the undersigned for all pretrial matters by order of Hon. Richard J. Arcara, dated March 30, 1998. It is presently before the court on Defendant's Omnibus Motion to dismiss the Indictment and to suppress evidence filed February 22, 2000 (Doc. # 156).

### BACKGROUND and FACTS

Defendant is charged, along with 21 others, in a single count indictment, alleging a conspiracy to commit wire and mail fraud, 18 U.S.C. §§ 1341; 1343, in violation of 18 U.S.C. § 371. Specifically, Defendant and his co-conspirators are alleged to have engaged in fraudulent sales of investments in germanium and indium,[1] metals used in various industrial applications. The 154 page indictment charges the conspiracy succeeded in effecting sales of these metals at inflated prices to vic-

tims residing within the United States through various telemarketing companies and by using mail drops located in the United States, Canada, the Bahamas and the Dutch Antilles during the period 1990 to 1993. Indictment, Introduction ¶¶ 1–5; 16. Defendant Fantin, along with Defendants Banks, Bidloff, and Dick are described as owners of two of the telemarketing companies, Eurocan Metals Group and Columbia Metals Group, located in Toronto, Ontario, used by the conspiracy to carry out its fraudulent designs. Indictment Count I, ¶¶ 1(a), (b); 8. In addition, Fantin is alleged to have operated, along with two other co-defendants and two unindicted persons, the Sandstone Group, a telemarketing company controlled by the conspiracy and located in the Bahamas. Indictment Count I, ¶¶ 1(d); 15. The Indictment also states that Fantin used two Toronto based companies, Danstef Investments and Short Arm Investments to receive funds from the alleged fraudulent telemarketing sales of investments in germanium and indium. Indictment Count I, ¶ 4. As a result of its operations, the conspiracy succeeded in defrauding persons within the United States of more than $10 million (U.S.).

The alleged fraudulent misrepresentations used by the conspiracy to defraud its victims consisted of falsehoods regarding the existence of an active speculators' market for germanium and indium, that the metals had a value significantly greater than was true at the time, that prices for the metals would experience imminent and significant increases resulting from government stockpiling and technology advances, that the sales companies making the representations agreed to buy back the customer's purchase at the customer's option, and that the salesman calling the customer was not making any commission on the initial sale. Indictment Count I,

---

1. Germanium, a greyish white brittle metaloid, resembles silicone and is used as a semiconductor. Merriam–Webster, Webster's Third New Int'l Dictionary 951 (1986). Indi-
um is a silvery white, highly fusible and malleable metal used as a coating on other metallic surfaces such as airplane engine bearings. *Id.*, 1152, 120 S.Ct. 534.

¶ 16(A), (B), (C), (D), (E), (F). Additionally, as a means to lull customers into believing the conspiracy's sales claims were legitimate, quantities of the metals were shipped to customers or stored in rented space within this district although such metals were relatively worthless. Indictment Count I, ¶ 22. Customers were also advised that the Tannen Trading Company, located in the Dutch Antilles, would assume customer assistance functions as a means of preventing detection of the fraud. *Id.,* ¶ 27. The Sandstone Group was used as a means to fraudulently obtain additional investments from the customers. Indictment Count I, ¶ 29. The fraudulent sales were carried out by salespersons, referred to as "openers," who made the initial "sale," and "loaders", experienced telemarketers who persuaded customers to increase their "investments." Indictment Count I, ¶ 18. Many of these salespersons are among the indicted co-conspirators. Indictment Count I, ¶ ¶ 9–13. The fraudulent scheme was perpetrated from locations in Toronto, Ontario, Canada; Miami, Florida; Saba, Dutch Antilles; and Nassau, The Bahamas. *Id.* ¶ 31.

The Indictment alleges 1, 376 overt acts in furtherance of the conspiracy. Fantin is specifically named in Overt Acts 3, 31–42, and 43–46. Overt Act 3 states Fantin and other co-conspirators met in 1993 to discuss the "partnership arrangement" regarding the Eurocan telemarketing company. Overt Acts 31–42 describe twelve payments totaling $212,083.11 received by Fantin, personally or through his company Danstef during the period November 25, 1992 and May 12, 1993, from Eurocan or Columbia Metals, two of the telemarketing companies operated by the conspiracy. Overt Acts 43–46 represent four payments of monies received by Fantin and co-defendant Banks personally or through Short Arm Investments between February 3, 1993 and April 27, 1993 from Eurocan in the total amount of $204,000.01.

The Indictment also alleges 1,179 overt acts described as fraudulent sales by members of the conspiracy to particular victims of the scheme stating the names of the victims, the dates of the fraudulent sales, and the amounts of the sales along with references to a Document Control Number ("DCN") which in turn refers to a DCN Discovery List. A copy of the DCN Discovery List has been provided to Defendant as part of the informal discovery phase of the case. Government's Response to Omnibus Motions filed March 14, 2000 (Doc. # 158) ("Government's Response") at 15; Exhibit B to Government's Response. Defense counsel were afforded an opportunity to review all of the physical evidence, as organized by the DCN system, which correlates the Government's evidence with the various alleged overt acts. *Id.,* ¶ 29.

Most of the Defendants have pleaded guilty; however, Bidloff, Bregman, and Bronson filed motions addressed in a Decision and Order and a Report and Recommendation which has been adopted and affirmed by the District Judge. Order filed January 24, 2000 (Doc. # 152); *United States v. Bidloff,* 82 F.Supp.2d 86 (W.D.N.Y.2000). Bregman subsequently pleaded. Meanwhile, Fantin opposed extradition from Spain on the Indictment, unsuccessfully, and was arraigned before the undersigned on November 4, 1999. Oral argument on Defendant's motions was conducted on March 23, 2000.

An Additional Memorandum on Search Issues was filed by the Government on March 27, 2000 (Doc. # 161) together with a copy of the Grand Jury's subpoena to the Metropolitan Toronto Police Department dated September 6, 1994; Defendant's Supplemental Memorandum of Law and Defendant's Affidavit dated April 11, 2000 (Doc. # 164), were filed April 11, 2000. On April 18, 2000, the Government filed an Affidavit in Opposition to Defendant's Memorandum (Doc. # 165). Based on the following, Defendant's motion should be DENIED.

## DISCUSSION

■ Defendant asserts the Indictment is defective as it fails to allege the exact

nature of false pretenses or misrepresentations attributable to Defendant. Defendant's Motion ¶ 10; Defendant's Reply ¶ 3. Defendant's position is based upon the same invalid premise as was asserted by co-Defendants Bidloff, Bregman, and Bronson. *United States v. Bidloff, et al.,* 82 F.Supp.2d 86, 91 Report and Recommendation dated May 12, 1999 (Doc. # 114) ("Bidloff R & R"). By order dated January 24, 2000, Judge Arcara adopted the Bidloff Report & Recommendation. *Bidloff et al., supra,* (Doc. # 152). Specifically, Defendant fails to acknowledge that because he is not charged with the substantive fraud offenses, alleged to be the illegal objects of the conspiracy, but rather with only the conspiracy itself, there is no requirement that greater specificity as to the precise nature of the false pretenses and misrepresentations employed by the conspiracy in furtherance of the scheme to defraud be articulated in the Indictment. *See Bidloff, supra,* 82 F.Supp.2d at 91–93. Moreover, as Defendant, unlike his co-Defendants, Bregman and Bronson, is not alleged to have acted as a telemarketer on behalf of the conspiracy, there is even less reason to require a specific allegation of any false pretenses or misrepresentations attributable to him individually. Additionally, the fact that such fraudulent statements made by the other co-conspirators in furtherance of the conspiracy are, as an evidentiary matter, admissible against Defendant to establish the unlawful objective element of the conspiracy count, Fed. R.Evid. 801(d)(2)(E); *United States v. Simmons,* 923 F.2d 934, 945 (2d Cir.1991) does not render the count, as alleged, defective under Fed.R.Crim.P. 7(c)(1) or the Sixth Amendment. Finally, as discussed in the Decision and Order, filed at the same time as this Report and Recommendation, Decision and Order dated June 19, 2000, at 6—7, the Indictment provides ample detail concerning the nature of the fraudulent statements attributable to the conspiracy, and there is therefore no basis to find that the Indictment taken as a whole fails to give reasonable notice of the nature and circumstances of the charge against Defendant. In sum, Defendant's motion to dismiss should be DENIED.

Defendant also moves to suppress evidence seized by Toronto Metropolitan Police pursuant to a warrant issued by an Ontario Justice of the Peace on September 23, 1994. Warrant attached as Exhibit B to Defendant's Motion. The warrant was issued on the basis of an investigation by Canadian authorities of suspected criminal fraud by several persons who are co-defendants in the instant proceeding, including Defendant. *Id.* The warrant was also based on information received by Detective Anthony Slot of the Toronto police from Mr. Terry Parnell, the manager of a commercial office building in North York, a municipality north of Toronto, Ontario who, on September 22, 1994, had informed Detective Slot that a company called First Madison International, Inc. ("First Madison") had occupied a suite at the building, Madison Center, located at 4950 Yonge St., North York. *Id.* According to Mr. Parnell, as First Madison was then $8,000 in arrears on its rent notices of default had been sent without payment, a second notice had been posted on the door of the premises, and the locks changed. *Id.* While securing the premises before changing the locks, Parnell observed investment literature and "lead cards" listing names of prospective investors. Because the information aroused Parnell's suspicion of possible wrongful activity, he contacted Detective Slot and arranged to allow Slot to inspect the premises. *Id.* While on the premises with Parnell, Slot discovered evidence of fraudulent sales of indium by Eurocan Metals and Columbia Metals, two of the entities named in the Indictment. The information garnered by Detective Slot was presented to Justice Oats in written form on an official application for a search warrant; however, the portion of the form calling for the signature of the applicant under oath and the signature of the issuing judicial officer administering the oath was not completed. *Id.* The war-

rant authorizes the police to seize the items of evidence described in the application from the premises. *Id.*

Defendant contends that as agents of the Federal Bureau of Investigation ("FBI") had conversations with Detective Slot prior to the search, such federal agents "substantially participated" in the search or the Toronto police acted as agents of the FBI in conducting the search. Defendant's Motion ¶ 21. In an affidavit submitted March 14, 2000, FBI Special Agent Michael Vincent states that although the FBI had been in contact with Toronto police as to obtaining "investigative information" obtained by the Toronto police regarding Defendant, Eurocan and Columbia Metals, at no time did the FBI direct or participate in the search of the premises at 4950 Yonge Street. Vincent Affidavit ¶ ¶ 4–5. Agent Vincent states that to facilitate obtaining the investigative information relating to the case, the FBI forwarded a Grand Jury subpoena to the Toronto police on September 6, 1994. Further, Agent Vincent avers that according to Detective Slot, the search was initiated solely by Canadian authorities based on their continuing investigation into Defendant's activities. *Id.* at ¶ 7–8. Vincent further affirms that he first was informed of the search not earlier than October 18, 1994. *Id.* at ¶ 8.

According to Defendant, he used Suite 908 as his business premises, and had "continual access to the premises" with his key even after the challenged search, and did not intend to abandon any of his property that may have been located at the premises. Fantin Affidavit, dated March 21, 2000, Exhibit A to Defendant's Reply, ¶ ¶ 2, 5. Defendant also asserts he did not consent to the entries which preceded the search nor the search itself. Fantin Affidavit ¶ 3. Defendant argues that the warrantless searches conducted by Parnell and Slot were illegal and that the fruits of the searches allegedly involving the FBI, including the warrant, should be suppressed, Defendant's Motion ¶ 38, and that

the warrant fails to comply with Fed. R.Crim.P. 41 as the warrant application fails to establish the warrant was issued upon oath. Defendant's Motion ¶ 57. Alternatively, Defendant requests an evidentiary hearing to determine the facts including the extent of the Government's actual involvement in the search. *Id.* ¶ 59. Defendant's arguments must fail because as a nonresident alien he has not demonstrated that the requirements of the Fourth Amendment should be applied to the challenged search.

■ In *United States v. Verdugo–Urquidez,* 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), the defendant, a Mexican national then detained in the United States in connection with a joint Mexico–United States investigation of defendant's drug smuggling into the United States, challenged a warrantless search of defendant's Mexican residences by Mexican police and United States DEA agents located in Mexico. *Verdugo–Urquidez, supra,* at 262, 110 S.Ct. 1056. The Supreme Court held that the Fourth Amendment does not extend to searches of property owned by aliens conducted by United States' agents acting in a foreign country unless such aliens have established a "previous significant voluntary connection with the United States." *Id.* at 271, 274, 110 S.Ct. 1056. Here, Defendant does not dispute he is a dual citizen of Italy, where he was born, and Canada, where he later obtained naturalized citizenship. Thus, under *Verdugo–Urquidez,* unless Defendant can show that prior to the challenged search, assuming Defendant's standing to do so, he had "come within the territory of the United States" and "established a significant voluntary connection with the United States" the Fourth Amendment does not apply to the search even assuming FBI involvement. *Verdugo–Urquidez, supra,* at 271, 110 S.Ct. 1056.

By a post argument affidavit submitted April 11, 2000, Exhibit A to Supplemental Memorandum of Law on Behalf of Walter Fantin Addressing Search Issues (Doc.

# 164), Defendant has attempted to meet the prerequisites for applicability of the Fourth Amendment to a foreign search directed to the property of a non-citizen of the United States as enunciated in *Verdugo–Urquidez.* In his affidavit, Defendant asserts a number of pre-search contacts with this country. However, the court finds that none, considered either individually or in combination, is sufficient to meet this test. According to Defendant, "over 35 years ago" he traveled from Canada to Buffalo on shopping trips and to enjoy locally available entertainment. Fantin Affidavit ¶ 3. He also claims to have vacationed in Florida with his two now adult children and frequently visited Watkins Glen, a popular auto racing venue in this district. *Id.* ¶¶ 4–5. Further, Defendant states he, between 1990–1993, rented business space in Buffalo and "visited" the premises weekly. *Id.* ¶ 6. Defendant also claims to have "utilized" a local bank to exchange his Canadian currency during these visits, occasionally staying overnight in a local hotel. *Id.* ¶ 8. Finally, Defendant says he, in 1993, advertised in a medium, "the Robb Report" for "a 'gold sovereign' coin" and that the ad was "directed exclusively toward Americans." *Id.* ¶ 10.

While in *Verdugo–Urquidez* the Court did not elaborate on how extensive an alien's contacts with this country need to be in order for Fourth Amendment protections to apply as to him and his foreign property, at least two indications are provided. First, the Court noted that an alien who lawfully enters the United States and resides in the country may acquire such protection. *Verdugo–Urquidez, supra,* at 271, 110 S.Ct. 1056. Second, the Court posited that a "prolonged" prison sentence could also conceivably meet the threshold. *Id.* at 271–72, 110 S.Ct. 1056. However, in *Verdugo–Urquidez,* the Court found Defendant was, at the time of the search, in the United States "only a matter of days." *Id.* at 271, 110 S.Ct. 1056.

Here, Defendant fails to show any basis to find he was physically "in the United States" at the time of the search. Indeed, the Government represents, and Defendant has not disputed, that at the time of the investigation by Toronto authorities, which resulted in the search of the Yonge Street premises, Defendant was living in either the Carribean or Spain. Affidavit of Martin J. Littlefield, dated April 18, 2000, (Doc. # 165), ¶ 11. Significantly, Defendant's Affidavit is silent as to his whereabouts prior to and at the time of the search. Thus, there is no basis to believe the Defendant was physically within the United States prior to the search. Nor are Defendant's asserted earlier contacts with this country sufficient to establish the required degree of nexus. Defendant's recollections as to his social visits are equivalent to that of a casual visitor or tourist. If accepted as meeting the standard set by *Verdugo–Urquidez,* every foreign visitor to the United States could conceivably invoke Fourth Amendment protections against searches in his own country. Defendant's asserted prior contacts with this country, even if true, are either too transitory or stale to qualify for such extraordinary relief under *Verdugo–Urquidez.*

Nor is Defendant's assertion as to having had a prior relationship with this jurisdiction in the form of leased space sufficient. First, Defendant provides no corroborative evidence of the purported lease or his asserted weekly visits. *See* Fantin Affidavit, *supra.* Second, Defendant provides no details as to nature of the lease activity, if any, conducted on the leased premises. *Id.* In fact, Defendant even fails to supply the address of the leased premises. Such failure supports an inference that the asserted lease is purely imaginary or that, even if fact, no significant legitimate business or personal activity sufficient to meet the *Verdugo–Urquidez* requirements occurred at the premises. Thus, the court need not determine whether a lease of premises in this country by a lawfully admitted alien, coupled with only weekly visits to the

premises, is sufficient under *Verdugo–Urquidez.* Finally, the isolated placing of an advertisement does not constitute an economic transaction of significance, nor does Defendant provide any details as the frequency of the advertisement, its costs, or the number of purchases resulting therefrom. In sum, Defendant's proffered contacts are undocumented and thus fail to satisfy the requirements of *Verdugo–Urquidez.*

▪ ■■■ Alternatively, should the District Judge find the Defendant has satisfied the *Verdugo–Urquidez* test, the motion should nevertheless be denied as Defendant has failed to establish that in obtaining the warrant and conducting the search, Detective Slot acted as an agent of the Government. *United States v. Maturo,* 982 F.2d 57, 61 (2d Cir.1992), *cert. denied sub nom. Pontillo v. United States,* 508 U.S. 980, 113 S.Ct. 2982, 125 L.Ed.2d 679 (1993). Further, even if the initial entry of the Toronto premises by the building manager constituted a trespass as to Defendant, it is well settled that absent government instigation of the entry, the fruits of the private search are not subject to suppression. *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *United States v. Bennett,* 709 F.2d 803, 805 (2d Cir.1983), *revised, United States v. Bennett,* 729 F.2d 923 (2d Cir.1984), *cert. denied,* 469 U.S. 1075, 105 S.Ct. 572, 83 L.Ed.2d 512 (1984).

Here, Defendant offers no specific evidence, other than unsubstantiated information and belief that the Canadian authorities had communicated with the FBI prior to the search, to support his assertion that the Canadian police acted at the behest of the FBI. Nor has Defendant advanced any information from Mr. Parnell, the building manager, to even suggest he was importuned by either the Toronto police or the FBI to enter the premises. As noted, it was Parnell who invited the police to investigate the premises. In fact, Defendant does not contradict Mr. Parnell's statement, as related by Detective Slot's affidavit, that the tenant of the premises was Amran Cohen, not Defendant, and that a substantial amount of rent was long overdue and, as a result, the lease was in default, or that a notice of default was posted on the door to the premises. In short, Defendant has not advanced any facts which require an evidentiary hearing regarding the role of the FBI in the search as alleged by Defendant. *United States v. Pena,* 961 F.2d 333, 339 (2d Cir.1992). Accordingly, even if the Fourth Amendment extends to the Toronto premises, there is no basis to find that either of the private searches by Parnell or the executed Canadian warrant are attributable to the FBI.

Finally, Defendant's affidavit also fails to establish a sufficient interest in the premises justifying a finding that he has standing to challenge the searches at issue. *Rawlings v. Kentucky,* 448 U.S. 98, 104–105, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (burden of proof is on defendant to establish he had a legitimate expectation of privacy in place searched such that defendant has standing to seek suppression of evidence obtained as a result of that search). Here, Defendant avers he had access via key to the premises. Fantin Affidavit ¶ 5. However, the mere fact of access to premises alone is insufficient to establish one has a reasonable expectation of privacy at to such premises.

■■■ According to the information received by the Toronto police from the building manager, the premises was leased to Mr. Amran Cohen and to be occupied by First Madison International, Ltd. Exhibit B to Defendant's Motion. Thus, absent an affidavit from Mr. Amran stating Defendant's right to use the premises Defendant's unsupported assertions of having a means of access, despite a change of locks, or a more detailed explanation of the nature of his alleged business activities at the premises, the ability to access the premises, even if true, does not establish Defendant possessed a sufficient nexus to the premises to support standing. Nor

does Defendant's conclusory assertion of conducting business at the premises warrant an evidentiary hearing as Defendant has the burden to establish standing. *Pena, supra,* at 339.

■ The question of standing to challenge the search of business premises must necessarily be decided on a case-by-case basis, with the defendant bearing the burden of establishing standing. *United States v. Chuang,* 897 F.2d 646, 649 (2d Cir.) (citing *O'Connor v. Ortega,* 480 U.S. 709, 718, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987)), *cert. denied,* 498 U.S. 824, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990). For example, in *O'Connor, supra,* the Supreme Court held that an employee responsible for training in a hospital's residency program, had a reasonable expectation of privacy in his desk and file cabinets located in his office, where the employee established he did not share desk or file cabinets with any other employees, and his desk and file cabinet contained only personal items.

■ "The question whether a corporate officer has a reasonable expectation of privacy to challenge a search of business premises focuses principally on whether he has made a sufficient showing of a possessory or proprietary interest in the area searched." *Chuang, supra.* He must also demonstrate a "sufficient 'nexus between the area searched and [his own] work space.'" *Chuang, supra* (quoting *United States v. Britt,* 508 F.2d 1052, 1056 (5th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 42 (1975)). Generally, courts recognize a privacy interest in business premises "where the area searched is set aside for the defendant's exclusive use, such as an individual office." *United States v. Hamdan,* 891 F.Supp. 88, 94 (E.D.N.Y.1995), *aff'd,* 1996 WL 308273, 101 F.3d 686 (2d Cir.1996).

■ Here, Defendant's affidavit fails to establish either a possessory or proprietary interest in the premises searched. Defendant does not explain the nature of his arrangements with the lessee, Amran, nor the actual extent of his use of the premises. Particularly, Defendant does not claim to have had exclusive use of an office area or even a separate telephone line. Defendant also does not assert a possessory interest in any of the evidence seized under the warrant. As Defendant is not an officer, employee or sublessee of First Madison, and has not asserted that he was granted exclusive control over any portion of the premises by First Madison or Amran, Defendant cannot show he enjoyed a reasonable expectation of privacy as to any part of the premises and, accordingly, lacks standing. *See United States v. Sarkisian,* 197 F.3d 966, 986–87 (9th Cir. 1999) (holding defendants lacked standing to challenge search of commercial storage room where, although listed on lease as possessing right to access storage room which was kept locked, neither defendant claimed any interest in items seized during search, demonstrated they had ever stored materials in or the extent to which they utilized space, or paid any part of rental fee), *cert. denied sub nom. Mikayelyan v. United States,* 530 U.S. 1220, 120 S.Ct. 2230, 147 L.Ed.2d 260 (2000). *Cf. United States v. Chaves,* 169 F.3d 687, 691 (11th Cir.) (holding defendant had standing to challenge search of warehouse where he established he possessed *only key* to warehouse and stored personal and business papers there), *cert. denied sub nom. Garcia v. United States,* 528 U.S. 1022, 120 S.Ct. 534, 145 L.Ed.2d 414 (1999).

## CONCLUSION

Based on the foregoing, Defendant's motion to dismiss and to suppress evidence, or alternatively, for an evidentiary hearing should be DENIED.

June 19, 2000.