**UNITED STATES of America,**

v.

**Jose SANTIAGO, et al., Defendants.**

**No. 00 CR 237(VM).**

United States District Court,
S.D. New York.

Oct. 31, 2001.

Aitan D. Goelman, Assistant U.S. Attorney, Mary Jo White, U.S. Attorney, New York City, for plaintiff.

Gary S. Villanueva, Ricco & Villanueva, New York City, for defendants.

### DECISION AND ORDER

MARRERO, District Judge.

Seven defendants in this case—Jose Santiago ("Santiago"), Jose Baerga ("Baerga"), Julius Williams ("Williams"), Antonio Rodriguez ("Rodriguez"), Joseph Rini ("Rini"), Adrian Agostini ("Agostini") and Julian Marquez ("Marquez")—bring before the Court different pretrial motions seeking, among other forms of relief, severance, suppression of evidence and pre-trial disclosure. As indicated below, several other defendants charged in the same indictment, while joining in aspects of the instant motions, did not file their own.[1] Oral argument in connection with these motions was heard on June 22, 2001. For the reasons set forth below, the motions are granted in part and denied in part.

## I. BACKGROUND

On November 14, 2000, the Government filed sixteen count Indictment S3 00 Cr. 237 (the "Superseding Indictment") in this case charging eighteen defendants with engaging in racketeering and narcotics activities in this District from in or about 1994 through and including March 21, 2000.[2]

Count One of the Superseding Indictment charges that a racketeering enter-

1. Specifically, counsel for defendants Guttierez, Diaz, Rivera and Gomez appeared at the oral argument, although they had not submitted any motion papers. Guttierez and Diaz—through counsel—orally requested leave to join the motions of their co-codefendants insofar as such motions were applicable to them.

2. The original indictment was filed on March 9, 2000. It named seventeen defendants, two of whom entered guilty pleas before the Su-

prise known as "Thief David's Crew" operated in the Bronx, New York and engaged in various acts of violence. Eight racketeering acts are described as being committed in furtherance of such racketeering activity, including extortion, narcotics trafficking, murder, attempted murder and robbery. Count Two charges that certain defendants conspired to violate the racketeering laws of the United States.

Count Three charges other defendants with conspiracy to violate the narcotics laws of the United States by distributing and possessing with intent to distribute heroin, crack cocaine and marijuana. Count Three sets forth thirteen overt acts in furtherance of the narcotics conspiracy. The remaining thirteen counts charge various defendants with substantive crimes including murder, attempted murder and assault with a dangerous weapon.

To date, ten defendants charged in this matter have entered guilty pleas and have either been sentenced or are scheduled for sentencing: Renames Arroyo; Lawrence Cherry; Leighton Miles; Elvis Rodriguez; Juan Quinones; Roy Castro; Ruben Pacheco; Richard Mercado; Michael Cofield; and Juaquin Diaz. The remaining ten defendants include the seven defendants who filed motions in this case and the three of the four defendants who appeared through counsel at the oral argument. The trial in this matter is scheduled to commence on January 7, 2002.

## II. DISCUSSION

### A. SEVERANCE

Marquez, Rodriguez, Rini and Agostini move for severance of their trials, arguing that severance is warranted due to the length and attendant burdensomeness of a trial that aggregates all remaining defendants.[3] *See* Marquez Memorandum of Law in Support of Pre–Trial Motions, dated Feb. 6, 2001 ("Marquez Memo"), at 3–9; Rini Memorandum of Law, dated Feb. 20, 2001 ("Rini Memo"), at 11–16; Affirmation of Sanford M. Katz in Support of Rodriguez's Pre–Trial Motions, sworn to Mar. 8, 2001 ("Katz Aff."), at 11; Agostini Memorandum of Law in Support of Pre–Trial Motions, undated ("Agostini Memo"), at 7–8.

The movants further contend that they will suffer prejudicial spillover through a joint trial because the jury will improperly associate them with defendants accused of violent crime, especially Williams, whose alleged offense made him eligible for the death penalty. *See* Marquez Memo at 9–10; Letter from Sanford M. Katz to the Court, dated May 2, 2001 ("Rodriguez Reply"), at 1; Katz Aff. at 12; Agostini Memo at 3–7. In addition, Marquez and Rini argue that severance is particularly appropriate in their cases because they are charged in Count Three only—the narcotics conspiracy—and the jury will be incapable of independently evaluating the evidence pertaining to their alleged narcotics violations and the evidence pertaining to the violent crimes committed by the racketeering enterprise. *See* Marquez Memo at 2–3; Rini Memo at 15. Agostini attempts to make the same argument, although he is charged in Count Eight—assault with a deadly weapon—and Count Three. *See* Agostini Memo at 3–7.

perseding Indictment was filed. The Superseding Indictment maintained charges against fifteen of the defendants originally named and added three new defendants.

3. At oral argument, Diaz's counsel requested that Diaz be permitted to join the severance motions filed by his co-defendants. *See* Transcript from Oral Argument, dated June 22, 2001 ("Tr."), at 48. Like Marquez and Rini, Diaz claims that severance is especially strong in his case because he is charged only in Count Three of the Superseding Indictment.

As a preliminary matter, the Court notes that the Government responded to its order inquiring about the status of the Government's position regarding Williams by submitting a letter dated July 19, 2001 indicating that the Government would not seek to impose the death penalty against Williams. In light of this determination, the four defendants requesting severance may not prevail insofar as the motions are predicated upon Williams's eligibility for the death penalty.

■ Generally, Rule 14 of the Federal Rules of Criminal Procedure permits a trial judge to grant the severance of defendants "[i]f it appears that a defendant or the government is prejudiced by . . . joinder for trial together." Fed.R.Crim.P. 14. Rule 14, however, does not require severance even if prejudice is shown; rather, the tailoring of relief, if any, is left to the trial court's sound discretion. *See United States v. Haynes*, 16 F.3d 29, 32 (2d Cir. 1994). In fact, the federal judiciary harbors a strong presumption in favor of joinder as a mechanism for promoting judicial efficiency (*see United States v. Gallo*, 668 F.Supp. 736, 748 (E.D.N.Y.1987)), and limiting instructions to the jury have emerged as the preferred device for curing any prejudicial spillover that may result from a multi-defendant, multi-count trial. *See Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *United States v. Diaz*, 176 F.3d 52, 103–04 (2d Cir.), *cert. denied*, 528 U.S. 875, 120 S.Ct. 181, 145 L.Ed.2d 153 (1999).[4]

■ The *Gallo* court determined that a trial judge should consider the following factors in determining whether severance

is warranted: (1) the number of defendants and the number of counts; (2) the complexity of the indictment; (3) the estimated length of the trial; (4) disparities in the degrees of involvement by defendants in the overall scheme; (5) possible conflict between various defense theories; and (6) prejudice resulting from evidence admissible as to some defendants, but not others. *See Gallo*, 668 F.Supp. at 749. While none of these factors is dispositive, each is intended to provide guidance as to whether a jury will be capable of considering the evidence as to each defendant separately, independent of evidence against co-defendants. *See id.* The moving defendant bears the burden of showing "facts demonstrating that he will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial." *United States v. An–Lo*, 851 F.2d 547, 556 (2d Cir.), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988) (quoting *United States v. Rucker*, 586 F.2d 899, 902 (2d Cir.1978)).

■ In this case, the Court is not persuaded that severance is necessary. Defendants have not shown that a joint trial will prejudice them to a degree amounting to a miscarriage of justice. *See United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993), *cert. denied*, 511 U.S. 1042, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994). This is true in large part because, despite defendants' avowals to the contrary, the racketeering and narcotics conspiracy charges in the Superseding Indictment are not mutually exclusive such that defendants accused of the narcotics involvement have no relationship to those charged with racketeering. Moreover, it has been noted that "differing

---

4. The Supreme Court noted in *Richardson v. Marsh*, 481 U.S. 200, 210, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987): "It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand."

levels of culpability and proof are inevitable in any multi-defendant trial and standing alone, are insufficient grounds for separate trials." *United States v. Nunez*, No. 00 Cr. 121, 2001 WL 91708, at *3 (S.D.N.Y. Feb. 1, 2001) (quoting *United States v. Carson*, 702 F.2d 351, 366–67 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983)). Defendants have simply failed to satisfy their burden because "even if the Court were to grant severance, much of the evidence regarding ... codefendants' acts of violence would be admissible in ... [their] trial as proof of the existence and nature of the narcotics conspiracy." *United States v. Muyet*, 945 F.Supp. 586, 596 (S.D.N.Y.1996).

Finally, ten defendants have already entered guilty pleas, and it is conceivable, as the Government has represented to the Court, that additional pleas may be entered. To that end, the Court is confident that this case—if it does go to trial—will not present such complicated legal and factual issues that the jury in its deliberations will be prone to misapply the evidence relevant to particular defendants and charges. Any risk of this kind can be mitigated through carefully crafted limiting instructions that warn the jurors to take into account only the evidence admissible against each defendant.

### B. SUPPRESSION OF EVIDENCE

#### 1. Suppression of Post–Arrest Statements

Defendants Williams, Rodriguez and Marquez move to suppress certain statements each allegedly made following his arrest. *See* Williams's Memorandum of Law in Support of Motion to Suppress, dated Feb. 12, 2001, at 1–10; Katz Aff. at 9–10 and Ex. A; Rodriguez Reply at 2; Marquez Memo at 10–11.

It is well established that the prosecution is barred from using statements made during the custodial interrogation of a defendant if *Miranda* warnings are not properly administered. *See Miranda v. Arizona*, 384 U.S. 436, 443, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A defendant can waive his rights and agree to respond to questions, but such a waiver is not effective unless it is made voluntarily, knowingly and intelligently. *See id.* at 444–45, 86 S.Ct. 1602.

■ A court may conclude that the waiver of *Miranda* rights is effective "only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)). Such an approach permits consideration of factors like " 'age, experience, education, background, and intelligence,' as well as 'whether the defendant has the capacity to understand the *Miranda* warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' " *United States v. Dickerson*, 113 F.Supp.2d 324, 326 (N.D.N.Y.2000) (quoting *Fare*, 442 U.S. at 725, 99 S.Ct. 2560).

■ *Miranda* safeguards come into play when a person in custody is subjected to express questioning or its functional equivalent. *See Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). If a defendant invokes his right to counsel after *Miranda* warnings are read, the Government is barred from questioning the defendant in the absence of counsel. *See Miranda*, 384 U.S. at 444–45, 86 S.Ct. 1602. However, the Government's obligation to refrain from interrogating a defendant outside the presence of his attorney "is not breached unless the Government has taken some action 'that was de-

signed deliberately to elicit incriminating remarks.'" *United States v. Romero*, 97 Cr. 650, 1998 WL 788799, at *2 (S.D.N.Y. Nov. 10, 1998) (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986)).

### a. *Williams's Suppression Motion*

Williams averred that the arresting officers interrogated him before reading him his *Miranda* rights. *See* Affidavit of Julius Williams, sworn to Feb. 12, 2001, ¶¶ 7, 10. Williams maintains that *Miranda* warnings were administered only after he was asked several questions regarding the death of Allen McLeod ("McLeod"), the individual he is accused of murdering. *See id.*, ¶¶ 9–10.

■ The Government acknowledged that a hearing to determine the admissibility of Williams's post-arrest statements was required by the rule announced in *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir.1998). *See* Government's Memorandum in Opposition to Defendants' Pre-Trial Motions, dated Apr. 23, 2001 ("Government Memo"), at 44. In that case, the Second Circuit held that a defendant's bare assertion that his *Miranda* rights were not read to him prior to the commencement of interrogation created a sufficient factual dispute to justify a hearing. *See Mathurin*, 148 F.3d at 69. Thus, the Court granted Williams's motion for a hearing on this suppression claim and held a hearing on September 7, 2001.

■ At the hearing, the Government produced one witness, Detective David Gallinari ("Gallinari") of the New York City Police Department, who conducted the interrogation of Williams at the 40th Precinct Detective Squad shortly after his arrest on July 10, 1998. *See* Transcript from Hearing, dated Sept. 7, 2001 ("Williams Tr."), at 10, 18. It was Galli-

nari who read Williams his *Miranda* rights. *See id.* at 11–12, 22–23.

According to Gallinari, his questioning of Williams commenced at 3:00 p.m. after the *Miranda* rights were read (*see id.* at 10, 22–23), and Williams, though refusing to sign the standard *Miranda* waiver form, nonetheless made statements that he was in New Jersey at BJ's when he heard on the news that McLeod was killed; that he did not know anything about the McLeod killing; that he knew McLeod and McLeod's brother from the projects; and that he did not know anyone named Thief David, Cuso, Eric Ortiz or Juaquin Diaz. *See id.* at 12–13; Affidavit of Richard W. Brewster, sworn to Feb. 12, 2001, Ex. C.

Subsequent to this exchange, which lasted approximately five minutes (*see* Tr. at 28), Williams refused to answer any more questions, and Gallinari stopped questioning him. *See id.* at 13–14, 32–33. Gallinari made a contemporaneous report of the interview, attaching a copy of the *Miranda* rights waiver form with a notation that Williams had declined to sign it. These documents were admitted into evidence at the suppression hearing. *See* Tr. at 15, 35.

Williams—through counsel—asserts that the statements attributed to him were made *prior* to the Miranda warnings and that his refusal to sign the explicit waiver form provided by Gallinari indicated a reluctance to further participate in the interview and a desire not to waive his rights. *See* Williams Tr. at 24–25. Simply put, Williams claims that when a defendant refuses to sign an explicit waiver card and a law enforcement officer proceeds with questioning, the answers are involuntary and the waiver is not knowing, intelligent or voluntary. *See id.* at 41–42, 50; Letter from Williams's counsel to the Court, dated Sept. 14, 2001, at 1–3.

The Government has argued that a suspect's refusal to sign an explicit waiver card cannot be held to mean that *Miranda* warnings were not given; that a law enforcement officer cannot continue to question a defendant until explicitly stopped by the defendant; or that the refusal to sign, by itself, constitutes evidence of involuntariness. *See* Letter from the Government to the Court, dated Sept. 24, 2001, at 1–6.

The Court credits the testimony of Detective Gallinari and finds nothing in the record to indicate that Williams did not understand the *Miranda* warnings, his conversation with Gallinari, or the significance of waiving his rights. The Court further finds that there is no evidence in the record suggesting Gallinari engaged in any coercive or deceptive conduct during his interview with Williams. Focusing on Williams's refusal to sign the waiver card, the Court notes that while refusal to execute a written waiver may be taken as an indication that no waiver was intended or freely given, the signing of an explicit waiver form is not a constitutional prerequisite, and a waiver remains valid when a defendant indicates a willingness to answer questions but refuses to sign waiver. *See United States v. Spencer*, 995 F.2d 10, 12 (2d Cir.) (upholding finding of knowing and voluntary waiver where defendant admitted that he was presented with waiver form describing his *Miranda* rights and that he understood all his rights, despite his refusal to sign waiver form), *cert. denied*, 510 U.S. 923, 114 S.Ct. 323, 126 L.Ed.2d 269 (1993); *United States v. Maldonado–Rivera*, 922 F.2d 934, 972–73 (2d Cir.1990) (upholding district court's determination that defendant waived his *Miranda* rights despite refusal to sign explicit waiver form), *cert. denied*, 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1025 (1991); *United States v. Boston*, 508 F.2d 1171, 1175 (2d Cir.1974) ("[Defendant] does not urge that the absence of a written waiver automatically bars the admission of a confession. It is clear, in any event, that a written waiver is not required."), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975).

Based on the foregoing, the Court concludes that, in light of the short length of Gallinari's interview; Williams's prior experience in the criminal justice system; and the evidence, including Williams's refusal to execute the waiver form, that Williams's will was not overborne by coercive questioning, Williams's statement was voluntary. *See United States v. Vilar*, 141 F.3d 1152 (2d Cir.1998) (table).

The Court further concludes that Detective Gallinari properly apprised Williams of his constitutional rights under *Miranda* *before* he began to question Williams; that Williams waived his *Miranda* rights before he made any statements to Gallinari; that Williams's waiver was voluntary, intelligent and knowing; and that Williams was fully aware of the rights he waived and the consequences of waiving these rights. Accordingly, the Court denies Williams's motion to suppress his post-arrest statements.[5]

### b. *Rodriguez's Suppression Motion*

Rodriguez admits that his Miranda rights were properly administered. *See*

---

5. While Williams argued that there may not have been probable cause for his arrest on July 10, 1998 (*see* Williams's Memo at 9), his counsel did not introduce any evidence at the September 7, 2001 hearing to support this assertion, even though the Court invited him to do so and the Government addressed the issue (*see* Williams Tr. at 1–3, 5), and the Government has introduced evidence, including a July 9, 1998 witness identification, which establishes sufficient cause for Williams's arrest the following day. Accordingly, this portion of the motion is denied.

Katz Aff. at 9. However, he claims that after he expressed his intention to refrain from speaking until accompanied by counsel, an FBI agent—who was transporting him to FBI headquarters—"artfully tricked" him into a conversation about the shooting charged in Count Seven of the Superseding Indictment. *Id.* at 10. Rodriguez argues that the agent improperly drew him into conversation when Rodriguez simply "mused out loud" that he thought the New York state charge with respect to the same incident had been dismissed. *Id.* at 9–10.

On the heels of this comment, the agent purportedly began "prodding" Rodriguez, which resulted in Rodriguez remarking that the alleged victim "was only grazed . . . like two inches." *Id.* at 10. Not surprisingly, the Government paints a different picture of the conversation between Rodriguez and the FBI agent. The Government insists that the agent was simply responding to Rodriguez's inquiry about the nature of the Superseding Indictment when Rodriguez spontaneously and voluntarily offered the comment about the shooting. *See* Government Memo at 47–48.

The Government asserts that a hearing to determine the admissibility of Rodriguez's post-arrest statements should be denied on both procedural and substantive grounds. Procedurally, the Government argues that Rodriguez's failure to supply an affidavit alleging the involuntariness of his statement precludes him from obtaining a hearing. *See id.* at 46. As to the merits of Rodriguez's claim, the Government contends that coercion cannot be found in the agent's furnishing of information to Rodriguez pursuant to Rodriguez's own request. *See id.* at 48–49.

■ Courts in this Circuit frequently require motions to suppress evidence—in order to raise factual issues warranting a hearing—be accompanied by affidavits describing the facts giving rise to a claim of inadmissibility and have held that an attorney's affidavit is insufficient for this purpose. *See United States v. Gillette*, 383 F.2d 843, 848 (2d Cir.1967); *United States v. Belin*, No. 99 Cr. 214, 2000 WL 679138, at *5 (S.D.N.Y. May 24, 2000); *United States v. Vasta*, 649 F.Supp. 974, 986 (S.D.N.Y.1986). Unlike an allegation that *Miranda* warnings were not given, where a conclusory assertion suffices for purposes of obtaining a hearing, other grounds for suppression ordinarily must be supported by a factual exposition. *See Mathurin*, 148 F.3d at 69–70.

■ While it would have been preferable for Rodriguez to have submitted an affidavit detailing his claim of the coercive tactics government agents allegedly used to elicit the statement he seeks to suppress, the Court does not wish to compound this deficiency by exalting form over substance. Unlike factual issues that rest solely on objective, external events uniquely dependent on the suspect's personal knowledge and involvement, the question Rodriguez raises—whether he was duped by the agent—raises a matter that is inherently grounded on subjective facts, as well as on the state of mind and credibility of both Rodriguez and the police officer.

Under these circumstances, in the context of a determination regarding the voluntariness of a *Miranda* waiver, the key inquiry should be not whether Rodriguez expressed his allegation in a particular legal document, but whether he sufficiently described a detailed factual context, encompassing both objective and subjective circumstances, to squarely raise disputed issues of fact and state of mind that rest on credibility and that may give a plausible basis to his claim. In so concluding, the Court is mindful of the *Miranda* admon-

ishment that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda*, 384 U.S. at 476, 86 S.Ct. 1602.

Applying these considerations, the Court finds that Rodriguez has set forth sufficiently detailed facts under the analysis described above to warrant a hearing. Ordinarily, if it is the suspect who, upon receiving the *Miranda* warnings, initiates discussion with an officer, and the officer in response does not engage in express questioning or its "functional equivalent" and does not create an atmosphere in which his words and actions are "reasonably likely to elicit an incriminating response from the suspects", the suspect's statements may be deemed voluntary, and their use at trial is not prohibited. *United States v. Cota*, 953 F.2d 753, 759 (2d Cir. 1992) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)).

Here, Rodriguez maintains that he did not engage the agent in conversation but that the agent artfully tricked him and that he was thus essentially duped into incriminating himself. The Government, at this stage based on statements no more personally attested to than Rodriguez's, asserts that it was Rodriguez who initiated the conversation and made inculpatory statements without any prodding by the agent whatsoever. As advanced, the respective positions squarely raise a substantial factual dispute, the resolution of which fundamentally rests on an assessment of the credibility of Rodriguez and the agent. The Court concludes that a hearing is required in order to determine whether the agent's comments were in fact the product of an innocuous intent to edify Rodriguez about the Superseding Indictment's charges against him or whether they were calculated to encourage Rodriguez to reveal what he knew.

### c. *Marquez's Suppression Motion*

 Defendant Marquez requests suppression of statements he made to the police following his arrest on assault charges in 1997. *See* Marquez Memo at 10–11. Marquez claims that although his *Miranda* rights were administered to him, the "shock" of his arrest affected his mental state such that his statements were not knowingly and intelligently made. *See id.* At oral argument, counsel emphasized that Marquez's age at the time of his arrest (15 or 16 years old) contributed to his state of shock and that Marquez is "entitled to a hearing based upon his age." Tr. at 11.

The dearth of argument and precedent that Marquez devotes to his contention perhaps illustrates, at least, a somewhat commendable resort to candor as a proxy for the absence of legal authority. The Court surmises that many, if not most, criminal defendants, including the substantial number as young as Marquez was at the time of arrest, are shocked by their apprehension and custody. If astonishment were deemed to convincingly abrogate a defendant's capacity to voluntarily, knowingly and intelligently waive his *Miranda* rights, the number of suspected criminals invoking the doctrine would flourish, effectively nullifying the *Miranda* waiver. Such a loophole is unlikely to have escaped the Supreme Court's consideration.

Nonetheless, even if the Court did not summarily reject Marquez's "shock" theory of his suppression claim and were willing to consider that in a proper case "shock" may indeed vitiate the waiver of *Miranda* rights, Marquez does not cite to a single legal authority to support his position. Moreover, even under this expansive standard for which the Court has found no

**28**

authority, Marquez would not prevail for the simple reason that he fails to supply any facts with sufficient detail and specificity to justify a hearing. Marquez offers no more than a conclusory assertion and fails to describe why the nature and degree of his shock was disabling. Accordingly, Marquez's motion for suppression of his post-arrest statements, or in the alternative, for a hearing, is denied.

### 2. Suppression of Physical Evidence

Santiago moves to suppress physical evidence recovered from the vehicle he was driving when arrested on March 15, 1998. See Santiago Memorandum of Law in Support of Pre–Trial Motions, dated Feb. 21, 2001 ("Santiago Memo"), at 4–6. Santiago alleges that the search was unreasonable under the Fourth Amendment because New York City police officers did not conduct a narrow inventory search for purposes of impounding the vehicle, but instead used the impoundment as an opportunity to act excessively on their suspicions of his criminality. See id. at 5–6. The physical evidence recovered from the car includes a loaded .22 caliber Derringer; a loaded Lorcin .380 caliber semiautomatic; stolen license plates; and bullets. See Government Memo at 34; Affirmation of Gary S. Villanueva, sworn to Feb. 21, 2001 ("Villanueva Aff."), ¶ 6.

In order to sustain a challenge to the legality of a search, a defendant must demonstrate that the Government infringed his Fourth Amendment rights. See Rakas v. Illinois, 439 U.S. 128, 133, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Fourth Amendment rights are personal and cannot be vicariously exercised. See Simmons v. United States, 390 U.S. 377, 389, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

In Rakas, the Supreme Court rejected petitioners' argument that they had been subjected to an illegal search as passengers in another person's car. The Rakas Court held that petitioners' failure to establish a property or possessory interest in the car or the items seized precluded them from arguing that their Fourth Amendment search and seizure rights had been violated. See Rakas, 439 U.S. at 148, 99 S.Ct. 421. The Court also reaffirmed its holding that the expectation of privacy in a car is not equivalent to the privacy expectation in a home. See id. at 148, 99 S.Ct. 421; see also United States v. Martinez–Fuerte, 428 U.S. 543, 561, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).

In United States v. Smith, 621 F.2d 483, 489 (2d Cir.1980), cert. denied, 449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981), the Second Circuit expounded upon the status of the law in the wake of Rakas. In a challenge to the admissibility of search and seizure evidence, the court declared:

> The threshold question must be whether the defendants had any legitimate expectation of privacy in the area searched; only after that analysis is completed and the answer is yes may the defendant challenge the use of the fruits of the search as evidence. Thus, the threshold question of whether the defendant had a legitimate privacy expectation and the subsequent use of the fruits of the contested search as evidence are entirely separate and distinct.

Thus, in the instant case, it must initially be determined whether Santiago had a legitimate expectation of privacy in the car he was driving at the time of his apprehension and from which the challenged evidence was seized. "To prove this privacy interest, it is not necessary that defendant own the vehicle."

Instead, defendant must show, among other things, "a legitimate basis for being in the vehicle, such as permission from the

owner." *Ortega v. United States,* 897 F.Supp. 771, 777–78 (S.D.N.Y.1995). Under Second Circuit precedent, permission from the owner of a car to use it and possession of the car keys have been held to establish an adequate privacy interest such that a defendant may challenge the fruits of a search. *See United States v. Ochs,* 595 F.2d 1247, 1253 (2d Cir.), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979). *See also, United States v. Ponce,* 947 F.2d 646, 649 (2d Cir.1991), *cert. denied,* 503 U.S. 943, 112 S.Ct. 1492, 117 L.Ed.2d 633 (1992).

 As the Government points out, Santiago did not allege in an affidavit that he had an ownership or possessory interest in the car. *See* Government Memo at 33. In his moving papers, however, Santiago insists that he had lawful possession of the car. *See* Santiago Memo at 5 n. 1. This contention was repeated at oral argument when Santiago's counsel stated:

> The entire record before this court demonstrates that Mr. Santiago was driving the car in which he had the keys, in which he possessed the relevant and necessary ownership papers, including registration and insurance card, that when that car was stopped the police officers contacted the custodian or registered owner. All facts indicated that Mr. Santiago had lawful possession of the vehicle.

Tr. at 20.

The Court indicated above, in connection with Rodriguez's motion, that it was loathe to deny a motion for a suppression hearing, despite the lack of an affidavit, if a defendant's claim to a hearing is sufficiently detailed in describing a factual dispute. The Court considered that indulgence appropriate, however, only in the context of a *Miranda* waiver alleged to have been induced by a law enforcement agent's deliberate ruse and where the factual dispute fundamentally rested on the credibility and state of mind of the agent and the suspect. That limited leniency does not help Santiago.

Santiago's assertion of lawful possession of the car amounts to little more than a conclusory statement about a matter grounded strictly on objective facts entirely within his personal knowledge. Among the factual assertions Santiago could have included to have made a more persuasive case that factual issues existed are: how he came to be in lawful possession of the vehicle; who the car's rightful owner is; for what purpose he was authorized to use the car; where he was authorized to use the car; and for what period of time he was authorized to use the car.

At a minimum, this type of information could have been set forth in Santiago's moving papers or by his attorney before the Court in order to substantiate his claim of lawful possession. The failure to explain in any manner whatsoever the nature of Santiago's lawful possession of the car fails to establish that he is entitled to a suppression hearing and is fatal to this suppression claim. Accordingly, the motion is denied.

### 3. Suppression of Eyewitness Identification Testimony

The motions of two defendants relate to evidence based on eyewitness identification testimony. First, Santiago further moves to suppress Victim # 8's identification of Santiago, evidence which is relevant to the witness tampering described as the third overt act under Count Three of the Superseding Indictment. *See* Santiago Memo at 3–4; Villanueva Aff., ¶¶ 8–12. Santiago argues that the identification procedure was impermissibly suggestive because officers showed only a single photograph of him to the witness. *See id.* In

the alternative, Santiago requests a hearing on the reliability of the identification. *See* Santiago Memo at 4; Villanueva Aff., ¶ 12.

Williams requests further discovery of any witness identification materials applicable to him in order to assess the need for a suppression hearing. *See* Williams's Memorandum of Law in Support of Motion for Discovery Regarding Eyewitness Identification Discovery, dated Feb. 14, 2001 ("Williams Memo"), at 6–7. As part of its discovery provided to Williams, the Government produced a photographic array containing pictures of six different men.

According to the Government, each of the subjects depicted is a relatively young black man with hair style, facial hair and other features that do not cause Williams to stand out in an impermissibly suggestive way. The Government states that Williams was identified from this array by Witness # 1. That witness, according to the Government, alleged that Williams is the man who the witness saw kill McCleod. Witness # 1, the Government asserts, lived in the same housing development as Williams and had known Williams for many years at the time of the identification.

Arguing that the photo array he received is so blurry that he cannot determine how closely the subjects resemble each other and that he is incapable of assessing whether his identification was suggestive, Williams seeks comprehensive information about all official identification procedures conducted in connection with his prosecution in the instant case, including the date, location, nature, participants, photograph arrays, recorded statements, and reactions of witnesses.

In *Simmons*, 390 U.S. at 383–84, 88 S.Ct. 967, the Supreme Court acknowledged that the use of photographs to identify suspected criminals entails some risk of misidentification. The possibility of error is more pronounced if the police proffer only a single photograph; somehow emphasize the photograph of the suspected culprit; or indicate to the identifying witness that they have other evidence confirming their suspicions of a person featured in a multi-photograph display. *See id.*

■ Nonetheless, the Court held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* at 384, 88 S.Ct. 967. The Second Circuit reiterated that eyewitness identification evidence is not reliable and must be suppressed "if suggestive evidence procedures have led to 'a very substantial likelihood of irreparable misidentification.'" *Dickerson v. Fogg*, 692 F.2d 238 (2d Cir.1982) (quoting *Simmons*, 390 U.S. at 384, 88 S.Ct. 967).

Since an improper identification procedure does not automatically necessitate the exclusion of witness identification testimony at trial, the admissibility of such evidence depends on the totality of circumstances attendant to the identification. *See Manson v. Brathwaite*, 432 U.S. 98, 110–14, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). In this context, the "totality of circumstances" refers to whether the witness identification is reliable despite the flawed process employed to obtain it. *See id.* at 114, 97 S.Ct. 2243.

In *Maldonado–Rivera*, 922 F.2d at 973, *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984, the Second Circuit explained that a two step inquiry is appropriate. "The first question is whether the pretrial identification procedures were un-

duly suggestive of the suspect's guilt." *Id.* This examination entails consideration of a number of factors associated with the photographic array, including its size, its contents, and how it was presented by police officers. *Id.* at 974. "If there is nothing inherently prejudicial about the presentation, such as use of a very small number of photographs or of suggestive comments, the principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to 'suggest to an identifying witness that that person was more likely to be the culprit.'" *Id.* (quoting *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir.1986)).

█ If the Court concludes that the pre-trial identification procedure was not unduly suggestive, any question as to its reliability goes to the weight of the evidence, not its admissibility. *See Maldonado–Rivera*, 922 F.2d at 973. Thus, the identification testimony may be introduced, but the defendant can attack its reliability before the jury.

On the other hand, if the Court finds that the identification procedure employed was prejudicially suggestive, then it must proceed to the second step of the admissibility inquiry. *See id.* Here, the Court asks whether the "in-court identification will be the product of the suggestive procedures or whether instead it is independently reliable." *United States v. Tortora*, 30 F.3d 334, 338 (2d Cir.1994) (quoting *United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir.1992), *cert. denied*, 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993)). Pretrial hearings to determine the admissibility of in-court identification testimony are not per se required, but they are favored for resolving disputes. *See Watkins v. Sowders*, 449 U.S. 341, 349, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981).

█ Regarding Santiago's motion, the Government acknowledges that the New York City Police Department detective investigating Santiago showed Victim # 8 a single photograph of Santiago for confirmation purposes. *See* Government Memo at 56. Reliance on a single photograph ordinarily would establish impermissible suggestiveness because, without comparative photographs, Victim # 8 had no alternative choices by which to test the certainty of his identification. *See Simmons*, 390 U.S. at 383, 88 S.Ct. 967 ("This danger [of misidentification] will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw.").

Despite the potential prejudice associated with the procedure by which Santiago was positively identified by Victim # 8, his suppression claim clearly runs afoul of the reliability inquiry. According to the Government, Santiago was no stranger to Victim # 8. Rather, he had significant occasions for prior exposure that included growing up in the same housing development, attending the same schools, seeing him on hundreds of occasions and having conversations with him. *See* Government Memo at 56–58. In fact, Santiago was accused in state court proceedings of witness tampering related to Victim # 8, and he there advanced the same suppression claim that is now included in this case. The claim was rejected in that forum. *See id.*

The detective who showed the single photograph to Victim # 8 testified in state court that he did so "as a confirmatory identification" because Victim # 8 stated that he "knew [Santiago] for a number of years; had seen him on hundreds of occasions; [and] had conversations with him in the past." *See id.*, Ex. B at 18, Ex. C at 39. Thus, this Court concludes that there is not a "very substantial likelihood of ir-

reparable misidentification" by the introduction of Victim # 8's identification testimony. *Manson,* 432 U.S. at 116, 97 S.Ct. 2243. Accordingly, Santiago's motion to suppress is denied.

■ Williams's motion presents a different question because, though the Government has treated and opposed his motion as such, he does not argue, at least at this stage, for suppression of identification testimony. Instead, he requests additional discovery that may support a suggestiveness argument. Williams's position is thus entirely dependent upon conjecture. The weight of authority in this District favors rejecting such a motion, although two different rationales have been adopted for doing so.

Under the first approach, trial courts have denied applications for additional discovery of official identification procedures on the grounds that disclosure "would be tantamount to the disclosure of a list of the Government's witnesses and could require the disclosure of 3500 material." *United States v. Marquez,* No. 91 Cr. 451, 1992 WL 88139, at *9 (S.D.N.Y. Apr. 22, 1992). *See also United States v. Reyes,* 922 F.Supp. 818, 840 (S.D.N.Y.1996). Courts which adopt the second approach have required defendants to satisfy a threshold showing of suggestiveness in order to obtain additional discovery. *See United States v. Torres,* No. 94 Cr. 466, 1995 WL 261531, at *5 (S.D.N.Y. May 4, 1995).

More recently, in *United States v. Bin Laden,* No. 98 Cr. 1023, 2001 WL 66314, at *1 (S.D.N.Y. Jan. 26, 2001) ("*Bin Laden I*)", Judge Sand permitted a defendant to obtain discovery with respect to "the date,

time, and place of any identification of [the defendant], including a description of the circumstances." Judge Sand reasoned that this information was material to the preparation of the defense and discoverable under Fed.R.Crim.P. 16, but limited his order to allow the Government to redact any portions of the required disclosure that would reveal the identity of any Government witness. *See id.*

■ Both *Bin Laden I* and the cases which have precluded additional discovery of official identification procedures hold that materials tending to reveal witnesses' identities are not proper for disclosure. This Court concurs in that course. Moreover, the Court endorses Judge Sand's view, expressed in *Bin Laden I,* that certain information pertaining to identification procedures is discoverable as of right under Rule 16(a)(1)(C).[6]

Applying this analysis, the Court concludes that Williams is entitled to a clearer copy of the photo array that resulted in his identification and details of the time and place where the identification occurred. Beyond that, the Government has already provided information detailing the nature of the identification, having stated on the record that Williams's identification was made by Witness # 1, who allegedly saw the crime and who had known Williams personally for decades because they lived in the same housing development. Williams is not entitled to know the identity of Witness # 1, whom the Government indicates it will produce at trial to offer the identification testimony upon which its case against Williams relies.

6. Fed.R.Crim.P. 16(a)(1)(C) provides: "Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are with in the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant."

Insofar as Williams's motion was in fact intended to argue for suppression of the identification evidence of Witness #1, at this stage, assuming the photographic array the Government provided Williams is what the Government purports it to be, the Court finds, given the totality of the circumstances before it, no adequate basis for granting the motion.

An array of six photographs is not impermissibly small. *See United States v. Bennett*, 409 F.2d 888, 898 (2d Cir.1969). And other than the assertion that the photocopy of the pictures the Government provided was blurry, Williams has expressed no other specific concern or offered any particular objection suggesting improper suggestiveness. *See Maldonado–Rivera*, 922 F.2d at 973. Any further concerns Williams may have regarding the circumstances of Witness #1's acquaintance with Williams and the reliability of such testimony may of course be pursued at trial under oath and subject to cross-examination.

### 4. *Suppression of Cooperating Witnesses' Testimony*

Baerga moves for suppression of all statements and testimony made by persons who are cooperating with the Government in order to obtain reduced sentences or to avoid a conviction altogether.[7] *See* Baerga Memorandum of Law in Support of Pre–Trial Motions, dated Mar. 16, 2001 ("Baerga Memo"), at 7–9. Baerga argues that permitting witnesses with cooperation agreements to testify violates the witness bribery statute, 18 U.S.C. § 201(c)(2), which prohibits giving, offering, or promising anything of value to a witness for or because of his/her testimony. *See id.*

Baerga cites just one case, *United States v. Singleton*, 144 F.3d 1343 (10th Cir.1998), to support his argument. Baerga fails to point out, however, that the Tenth Circuit, sitting *en banc*, vacated this decision the following year. *See United States v. Singleton*, 165 F.3d 1297 (10th Cir.), *cert. denied*, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999). Therefore, the case upon which this portion of Baerga's motion rests is no longer valid authority.

Moreover, so far as this Court is aware, every trial court in this District to consider the issue has firmly rejected the notion that cooperation agreements between the Government and its witnesses violate § 201(c)(2). *See e.g. United States v. Hall*, No. 98 Cr. 207, 1999 WL 236750, at *5 (S.D.N.Y. Apr. 21, 1999); *United States v. Percan*, No. 98 Cr. 392, 1999 WL 13040, at *1–2 (S.D.N.Y. Jan. 13, 1999); *United States v. Mejia*, No. 98 Cr. 4, 1998 WL 598098, at *1 (S.D.N.Y. Sept. 8, 1998); *United States v. Barbaro*, No. 98 Cr. 412, 1998 WL 556152, at *3 (S.D.N.Y. Sept. 1, 1998), *aff'd*, 242 F.3d 368 (2d Cir.2000); *United States v. Juncal*, No. 97 Cr. 1162, 1998 WL 525800, at *1 (S.D.N.Y. Aug. 20, 1998).

As emphasized by the *Bidloff* court in its thorough and well-reasoned discussion of this issue, "a federal statute … should not be understood to refer to the government unless the statute expressly so provides." *United States v. Bidloff*, 82 F.Supp.2d 86, 94 (W.D.N.Y.2000). Thus, since section 201(c)(2) does not evince an intent to apply to the Government, cooperation agreements between the Government and prospective witnesses at trials are not encompassed by the statute's prohibition on bribery. In addition, the Government

---

7. The Court notes that Baerga's counsel failed to appear at the June 22, 2001 oral argument in this matter. The Court's consideration of Baerga's motion, therefore, is limited to his written submission.

has long engaged in the practice of offering witnesses leniency in return for cooperation against other defendants, and defendants may test this practice through the art of cross examination.

The practice "dates back to the common law in England and has been recognized and approved" by Congress, the federal courts and the United States Sentencing Commission. *Percan*, 1999 WL 13040, at *2 (quoting *United States v. Nieves*, No. 397 Cr. 238, 1998 WL 740835 (D.Conn. Oct. 13, 1998)). Thus, this Court finds no merit in Baerga's suppression claim and denies the motion.

## C. *BILL OF PARTICULARS*

Santiago, Rodriguez, Rini and Baerga move for a bill of particulars, arguing that the Superseding Indictment is too vague to enable them to properly prepare their defense. *See* Santiago Memo at 1–3; Villanueva Aff., ¶¶ 13–15; Katz Aff. at 3–6; Rodriguez Reply at 2–3; Rini Memo at 4–6; Baerga Memorandum, dated Mar. 16, 2001, at 3–5 and Ex. A.[8]

The Government challenges defendants' allegation that they do not have sufficient information to prepare their cases. *See* Government Memo at 65. The Government maintains that the discovery it already has provided under Rule 16 satisfies the legal requirements with respect to the production to which criminal defendants are entitled. These disclosures, according

to the Government, have encompassed "videotapes, audio tapes, telephone records, photographs, various physical items, including firearms and narcotics, and voluminous documents." *Id.*

■■■■■■ Federal trial courts have broad discretion in determining whether or not to grant a motion for a bill of particulars under Fed.R.Crim.P. 7(f). *See Will v. United States*, 389 U.S. 90, 98, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967). The decisive inquiry in deciding such a motion is whether the indictment adequately advises "the defendant of the specific acts of which he is accused." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). In this spirit, a bill of particulars must be necessary, not just helpful to a defendant's preparation for trial. *See United States v. Trippe*, No. 00 Cr. 585, 2001 WL 434849, at *7 (S.D.N.Y. Apr. 27, 2001). The trial court should consider the following factors in evaluating the sufficiency of the indictment: the complexity of the offense; the clarity of the indictment; and the degree of discovery otherwise available to defendants. *See United States v. Shoher*, 555 F.Supp. 346, 349 (S.D.N.Y. 1983).

The Second Circuit has "consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approxi-

---

**8.** The movants largely seek the same particulars, including: (1) the dates, times, and locations in which defendants entered into the alleged conspiracies; (2) the identities of the persons who recruited them into the conspiracies; (3) the identities of the members of the alleged enterprise; (4) when and where narcotics were possessed and distributed, and the precise quantities of narcotics possessed and distributed; (5) precise statutes violated; (6) the extent and nature of defendants' involvement in the conspiracies; (7) the dates, times, and locations in which alleged overt acts were

carried out; (8) the identities and addresses of unnamed co-conspirators; (9) the identities and addresses of victims; and (10) the identities and addresses of witnesses. Some defendants list disclosure of the identities of witnesses as part of their request for a bill of particulars. Other defendants demand the same disclosure as a separate request. Since the analysis differs depending upon the legal authority pursuant to which the motion is made (Fed.R.Crim.P. 7(f) or discovery case law), the Court will consider disclosure of such identities under both bases.

mate terms." *United States v. Salazar,* 485 F.2d 1272, 1277 (2d Cir.1973), *cert. denied,* 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974). The trial court also should consider the consequences to prospective government witnesses and the possibility of perjury in deciding whether to grant a motion for a bill of particulars. *See United States v. Crisona,* 271 F.Supp. 150, 156 (S.D.N.Y.1967).

▉ A bill of particulars may not be used to compel the Government to provide pre-trial evidentiary details about its case, nor may it be used to compel disclosure of the Government's legal theories of the case. *See Muyet,* 945 F.Supp. at 599; *United States v. Biaggi,* 675 F.Supp. 790, 810 (S.D.N.Y.1987). The Government does not have to particularize all of its evidence. *See United States v. Davidoff,* 845 F.2d 1151, 1154 (2d Cir.1988).

In the context of prosecutions of narcotics conspiracies, courts have consistently refused to grant a bill of particulars requesting the following kinds of information: (1) when the conspiracy was formed; (2) when the defendant joined the conspiracy; and (3) how the Government alleges the defendant performed acts in furtherance of the conspiracy. *See United States v. Feola,* 651 F.Supp. 1068, 1132 (S.D.N.Y. 1987), *aff'd,* 875 F.2d 857 (2d Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989); *United States v. Persico,* 621 F.Supp. 842, 868 (S.D.N.Y.1985). Moreover, "since the Government is not required to charge any overt acts in the indictment, [any information of this kind] is, itself, more detailed than defendants have a right to demand with respect to the overt acts enumerated therein." *Feola,* 651 F.Supp. at 1133.

As noted above, defendants delineate the identities of unindicted co-conspirators as one of the categories of particulars included in their motion. This request requires a separate analysis subsumed within the general analysis for a bill of particulars. Defendants cite to *United States v. Nachamie,* 91 F.Supp.2d 565, 572–73 (S.D.N.Y.2000) to support their argument for disclosure of the identities of unindicted co-conspirators.

▉ In *Nachamie,* Judge Scheindlin noted that the Second Circuit has affirmed both the granting and the denial of such requested information. *See id.* at 572. The factors that should be considered in deciding the motion include: (1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the Government has otherwise provided adequate notice of the particulars; (4) the volume of pre-trial disclosures; (5) the potential danger to co-conspirators; and (6) the potential harm to the Government's investigation. *See id.* Judge Scheindlin remarked that "a review of the case law in this district reveals no clear distinction among circumstances in which courts grant a request for the names of known unindicted co-conspirators and circumstances in which they do not." *Id.* at 572.

This Court's own survey, however, reveals that cases in which disclosure has been granted exhibit some common characteristics. First, the identities of unindicted co-conspirators have been disclosed primarily in cases in which violence was not alleged. *See United States v. Savin,* No. 00 Cr. 45, 2001 WL 243533, at *3–4 (S.D.N.Y. Mar. 7, 2001); *Nachamie,* 91 F.Supp.2d at 573; *United States v. Tsoi,* No. 91 Cr. 592, 1992 WL 147614, *2 (S.D.N.Y. June 16, 1992), *aff'd,* 996 F.2d 302 (2d Cir.1993).

Second, in cases involving allegations of violent crime, there were other factors that convincingly militated in favor of disclo-

sure of the identities of unindicted co-conspirators. For instance, in *United States v. Lino*, No. 00 Cr. 632, 2001 WL 8356, at *12–13 (S.D.N.Y. Dec. 29, 2000), one defendant was accused of soliciting the murder of a cooperating witness. The Court, however, concluded that disclosure was warranted due to the large number of defendants charged (23 defendants in a 26 count indictment); the large number of schemes alleged (securities fraud, wire fraud, commercial bribery, money laundering, etc.); the wide-ranging nature of the predicate acts; and the voluminous discovery. *See id.* Although it granted defendants' request, the *Lino* court qualified its ruling by providing that the Government was authorized to withhold disclosure if the Government made a good-faith determination that revealing the identity of a particular unindicted co-conspirator would imperil that person. *See id.*

In *United States v. Bin Laden*, 92 F.Supp.2d 225, 235 (S.D.N.Y.2000) (*"Bin Laden II"*), which entailed accusations of substantial violence related to the bombing of the United States embassies in Tanzania and Kenya, Judge Sand determined that the unique circumstances of the case compelled the granting of a bill of particulars that identified unindicted co-conspirators. The court regarded as especially persuasive the geographical scope of the conspiracies charged (extending over twelve nations); the wide-ranging nature of the overt acts (from detonating explosives and transporting weapons to establishing businesses); and the ten-year duration of the alleged criminal conduct. *See id.* at 234–35.

The *Bin Laden II* court was also concerned that the defendants were vulnerable to unfair surprise at trial because of the numerous aliases and code names used by unindicted co-conspirators. This practice of concealing their identities would make it difficult for the defendants to determine to which co-conspirators the Government was referring. *See id.* at 241. The court, as was the case in *Lino*, permitted the Government to withhold the identities of any unindicted co-conspirators it believed would be imperiled by the disclosure. *See id.*

In this case, the Court considers the motions of defendants Santiago, Rodriguez, and Baerga separately from that of defendant Rini. As will be demonstrated, Santiago, Baerga and Rodriguez have not demonstrated that a bill of particulars is warranted as to them, and their requests are denied in their entirety. Rini, however, has made a persuasive case, and his motion is granted.

■ The Superseding Indictment challenged by defendants closely resembles the indictment held sufficient in *Muyet*, 945 F.Supp. at 599. The *Muyet* case involved a violent narcotics trafficking enterprise similar to Thief David's Crew. The details constituting the "sufficient information" of the *Muyet* indictment, which also are reflected in the Superseding Indictment under review here, included: (1) the names and aliases of defendant members of the RICO enterprise and conspiracy; (2) the name of the enterprise; (3) a brief description of the purposes, means and methods of the enterprise; (4) the area in which the enterprise operated; (5) the approximate duration of the enterprise; (6) details regarding the predicate acts of the RICO enterprise; (7) overt acts in furtherance of the narcotics conspiracy; (8) the names and aliases of defendants charged with firearm violations, the dates of those firearm violations and the crimes to which the firearm violations pertained; and (9) the names of most of the victims of the alleged violent acts. *See id.*

■ The Court also declines to grant these three defendants the particulars re-

quested with respect to unindicted co-conspirators. In addition to allegations of multiple acts of violence, this case does not sufficiently bear the characteristics regarded as critical in the cases in which disclosure has been granted. Defendants in this case do not argue that they have been buried by voluminous discovery; the indictment does not charge multiple schemes and conspiracies; there is no finding that the indictment is otherwise deficient; and there is a legitimate basis for concern about the safety of unindicted co-conspirators given the allegations of violence and witness tampering surrounding this case. *See Savin*, 2001 WL 243533, at *3; *Lino*, 2001 WL 8356, at *12–13; *Nachamie*, 91 F.Supp.2d at 573. Moreover, it certainly cannot be gainsaid that this case does not even begin to approach the monumental dimensions of all the unique circumstances surrounding *Bin Laden II*. Thus, the motions of defendants Santiago, Rodriguez and Baerga for a bill of particulars are denied in their entirety.

 Defendant Rini's motion presents a closer question. Rini is charged only in Count Three of the Superseding Indictment with narcotics conspiracy, and he is not included in any of the overt acts of that Count. At oral argument, his counsel steadfastly maintained that the indictment and discovery already produced did not adequately describe Rini's alleged offenses to enable him to prepare a thorough defense. *See* Tr. at 13–14; 40–43; 52–53. In fact, Rini's attorney stated that he is "unaware of my client's name being mentioned in the discovery." *Id.* at 13. Although the Government did not specify what kind of discovery it had provided to

Rini, it insisted that it is "simply not accurate" to say that it has not provided any information. *Id.* at 31.

This Court is persuaded that the single reference in the indictment to Rini justifies the granting of a narrowly tailored bill of particulars. As stated in *Feola*, 651 F.Supp. at 1133, "[w]here a defendant is named in only one count and particular information as to him has not been provided, his request for the time, location, and persons present at the time of the alleged transaction may be granted so that he may properly prepare his defense."

To that end, the Court directs the Government to produce to Rini a bill of particulars that consists of the following information: (1) how Rini is alleged to have participated in the narcotics conspiracy; (2) the approximate dates and times of that participation; and (3) the identities of any unindicted co-conspirators with whom Rini participated in the narcotics conspiracy that the Government intends to reference at trial. The identification of unindicted co-conspirators is justified because the indictment is not otherwise adequate as to Rini and because Rini is not accused of a violent crime. However, consistent with *Lino* and *Bin Laden II*, the Government may withhold disclosure upon a good faith demonstration that revealing the identity of a particular unindicted co-conspirator would imperil that person.

## D. *PRE–TRIAL DISCLOSURES*

### 1. *Fed.R.Crim.P. 16*

Rodriguez, Baerga and Marquez move for further discovery pursuant to Fed. R.Crim.P. 16.[9] Rodriguez requests an up-

---

9. None of the moving defendants complied with Local Criminal Rule 16.1 which requires that certain motions be accompanied by an affidavit certifying that counsel has conferred with the opposing party in a good faith effort to resolve disputes before bringing them before the Court. As an example of the importance of adherence to these rules, the Court notes that in the case of one defendant, the Court was compelled to parse twenty-seven

dated rap sheet; materials related to a state court indictment dismissed against him which is now charged in Count VII of the Superseding Indictment; a copy of any written statement provided by Rodriguez's co-defendant in the state court matter; and photos, notes, witness statements and reports from each photo array. *See* Katz Affirmation at 6–8; Rodriguez Reply at 3; Tr. at 7–8. Marquez requests, among other things, scientific reports and materials; information concerning informants; and statements of defendants, co-defendants and co-conspirators. *See* Marquez Memo at 11–24 and Ex. A. Finally, Baerga has submitted generalized requests that largely track the language of Rule 16. *See* Baerga Memo at 1; Kulcsar Aff., Ex. A.

Fed.R.Crim.P. 16(a)(1) provides for liberal pretrial discovery of a defendant's own statements, whether written, recorded, or oral, made "in response to interrogation by any person then known to the defendant to be a government agent." *United States v. Nakashian*, 635 F.Supp. 761, 772 (S.D.N.Y.1986), *rev'd on other grounds*, 820 F.2d 549 (2d Cir.), *cert. denied*, 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 392 (1987). Rule 16 does not authorize discovery of statements made by co-conspirators, co-defendants or witnesses. *See United States v. Percevault*, 490 F.2d 126, 131 (2d Cir.1974); *Nakashian*, 635 F.Supp. at 773. Rule 16(a)(1) also gives each defendant the right to discovery of his prior criminal record; documents, tangible objects, and reports of examinations and tests which are material to the preparation of a defense or are intended for use by the Government as evidence at trial; and any written summary of expert witness testimony that the Government intends to use during its case-in-chief at trial. *See* Rule 16(a)(1)(B-E).

To the extent the Government has not satisfied defendants' requests for any material that falls within the scope of Rule 16, it is ordered to do so within ten days of the date of this Decision and Order.

### 2. *Identities of Witnesses*

Marquez and Rini seek disclosure of the identities of witnesses who will testify for the Government at trial. *See* Marquez Memo at 23; Rini Memo at 10–11. While Rule 16 does not provide defendants with the right to obtain such information, the trial court has the discretion to order such disclosure upon a finding that a defendant's request is material to the preparation of his case and is otherwise reasonable. *See United States v. Cannone*, 528 F.2d 296, 300–01 (2d Cir.1975); *Nachamie*, 91 F.Supp.2d at 579. Materiality and reasonableness of the request should be assessed through application of a six-factor test set forth in *United States v. Turkish*, 458 F.Supp. 874, 881 (S.D.N.Y.1978).

The *Turkish* factors are as follows: "(1) Did the offense alleged in the indictment involve a crime of violence? (2) Have the defendants been arrested or convicted for crimes involving violence? (3) Will the evidence in the case largely consist of testimony relating to documents (which by their nature are not easily altered)? (4) Is there a realistic possibility that supplying the witnesses' names prior to trial will increase the likelihood that the prosecution's witnesses will not appear at

pages of specific discovery requests. While the Court appreciates the professional obligations of attorneys to be thorough in their representation, it is inconceivable that the Government had not already affirmatively responded to several of those requests, or that it would not have done so if approached. Exhaustive discovery applications submitted to the Court before counsel confer with the Government only serve to delay notification to the parties of the Court's decision.

trial, or will be unwilling to testify at trial? (5) Does the indictment allege offenses occurring over an extended period of time, making preparation of the defendants' case complex and difficult? (6) Do the defendants have limited funds with which to investigate and prepare their defense?" *Id.*

■■■ Application of the *Turkish* factors compels the Court to deny disclosure of the identities of the Government's witnesses. The first factor weighs decidedly against defendants because the indictment alleges crimes of violence, including murder, attempted murder and assault. The second factor also tilts against defendants because the criminal activities alleged in the indictment give rise to an inference that these defendants may have prior criminal records.

The Government represents that it has produced significant documentary evidence to defendants. In this Court's view, factors four and five reflect concerns about constraints placed on defendants by limited resources and difficulties of preparing for complex trials. In some circumstances, these considerations may weigh in defendants' favor in the Court's assessment of requests for additional disclosure regarding the identities of victims, witnesses and informants. Whatever weight favors defendants in these situations, however, is offset by the concerns embodied in this case in factor four.

Defendants here are accused of violent crime, including murder and attempted murder, and there is evidence of involvement by some of them in witness tampering. The Government has repeatedly asserted that disclosure of witness identities in advance of trial will jeopardize the safety of its witnesses. At oral argument, the Government even went so far as to state that witnesses living in the neighborhood where defendants allegedly carried out their racketeering and narcotics activities would have to be relocated, along with their families, if they testify at trial. *See* Tr. at 30.

The Court concludes that, given the allegations of violence pending against the defendants, and the accusations of a past history of witness tampering by at least two of them, the divulgence of the identities and addresses of the Government's witnesses is not justified. The Court's ruling is buttressed by defendants' failure to provide anything more comprehensive than a conclusory assertion that they require such information for the adequate preparation of their cases. *See United States v. Nunez,* No. 00 Cr. 121, 2001 WL 91708, at *8 (S.D.N.Y. Feb. 1, 2001) (stating that particularized showing of need is especially required in "cases where dangers such as witness intimidation, subornation of perjury or injury to witnesses exist, such as narcotics cases").

### 3. *Identities of Confidential Informants*

Marquez also requests disclosure of the identities of any confidential informants. *See* Marquez Memo at 13–14.

■■■ "Where the disclosure of an informant's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause, the [informant's] privilege must give way." *Roviaro v. United States,* 353 U.S. 53, 67, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). In order to prevail on a motion to compel the disclosure of the identity of a confidential informant, a defendant must show that the informant's testimony is material to the defense. *See United States v. Saa,* 859 F.2d 1067, 1073 (2d Cir.), *cert. denied,* 489 U.S. 1089, 109 S.Ct. 1555, 103 L.Ed.2d 858 (1988).

"The defendant is generally able to establish a right to disclosure 'where the informant is a key witness or participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence.'" *Id.* (quoting *United States v. Russotti,* 746 F.2d 945, 950 (2d Cir.1984)). However, even where the confidential informant was both a witness and participant in the crime with which the defendant is charged, courts have rejected disclosure of the informant's identity if the defendant was unable to show that the informant's testimony "would have been of even marginal value to the defendant's case." *United States v. Jimenez,* 789 F.2d 167, 170 (2d Cir.1986).

Marquez's motion is no more than a cursory recitation of the law pertaining to disclosure of confidential informants' identities. Marquez fails to inform the Court why such information is material to his defense. Indeed, he does not even offer a conclusory assertion to this effect. Motions replete with generalities, but devoid of all substance, are routinely rejected. *See United States v. Jones,* No. 00 Cr. 182, 2000 WL 1448640 (S.D.N.Y. Sept. 28, 2000) (holding that failure to show why pre-trial access to identities of confidential informants was material to defense barred disclosure); *United States v. Brown,* No. 94 Cr. 631, 1995 WL 236718, at *6 (S.D.N.Y. Apr. 24, 1995) (holding that a statement of the relevant law and the assertion that the informants are likely to be key witnesses insufficient to justify disclosure); *United States v. Martinez,* 634 F.Supp. 1144, 1150 (S.D.N.Y.1986) (stating that "mere speculation, however, that the informer may possibly be of some assistance does not overcome the strong public interest in protecting informants").

 Marquez's request to be permitted, "at the very least", to interview confidential informants before trial—is also unavailing. *See* Marquez Memo at 14. The *Saa* court recognized that "the right under *Roviaro* to information about an informant [is] not merely so that the defense can call the informant to testify, but so that it can seek to interview him first." *Saa,* 859 F.2d at 1074. The opportunity to interview confidential informants is still subject to a defendant's showing of materiality. Marquez has not made the requisite showing, and his motion is denied.

### 4. *Brady, Giglio,* and Jencks Act Materials

Marquéz, Rini, Rodriguez and Baerga request disclosure of exculpatory material under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); impeachment material under *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); and accelerated production of Jencks Act material pursuant to 18 U.S.C. § 3500.[10] *See* Marquez Memo at 14–16; Rini Memo at 8–10; Katz Aff. at 8–9; Kulcsar Aff., Ex. A at 7–14.

The Court denies defendants' *Brady* motions. The Government has specifically represented that it understands and intends to comply with its continuing obligations under *Brady. See* Government Memo at 69–70. Defendants do not contest this representation.

Regarding *Giglio* and Jencks materials, the Government has offered to provide defendants with both *Giglio* material and witness statements under 18 U.S.C. § 3500 "by the close of business on the Friday before trial begins." Government Memo at 75. The Court finds that this deadline

---

10. At oral argument, Guttierez joined in the motion for disclosure of *Giglio* and § 3500 material, arguing for production of both at least one week prior to trial. *See* Tr. at 48. Diaz joined in these motion as well. *See id.*

will provide adequate time for any remaining defendants to prepare for trial. *See United States v. Coppa,* 267 F.3d 132 (2d Cir.2001).

### 5. *Fed.R.Evid. 404(b)*

Marquez and Baerga move for timely disclosure of any "other crimes, wrongs, or acts" evidence, pursuant to Federal Rule of Evidence 404(b), that the Government intends to introduce at trial.[11] *See* Marquez Memo at 25–28; Baerga Memo at 5–6. Baerga also requests that the Court hold a pre-trial hearing on the admissibility of the Government's Rule 404(b) evidence. *See* Baerga Memo at 5–6.

Rule 404(b) excludes from trial "evidence of other crimes, wrongs, or acts" whose only purpose is to adversely reflect the character of the defendant. *See* Fed. R.Evid. 404(b); *Huddleston v. United States,* 485 U.S. 681, 685, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). Such evidence may be introduced, however, if it speaks to motive, opportunity, or knowledge in the case at bar. *See Huddleston,* 485 U.S. at 685, 108 S.Ct. 1496. Upon request of any defendant, the Government must provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial. *See* Fed.R.Evid. 404(b).

▮ The Government has agreed to produce Rule 404(b) evidence two weeks before trial. *See* Tr. at 52. The Court deems this ample notice to defendants and will permit disclosure of Rule 404(b) evidence to all remaining defendants in accordance with the schedule proposed by the Government.

Defendant Baerga's motion for a hearing on the admissibility of 404(b) evidence is denied. Until the time for production, it will not be known whether the Government intends to introduce any Rule 404(b) evidence at all, or whether it will introduce such evidence as to Baerga. Thus, Baerga may resubmit his motion when, and if, it becomes ripe.

### CONCLUSION AND ORDER

For the reasons set forth herein, it is hereby

**ORDERED** that the severance motions of defendants Marquez, Rodriguez, Rini and Agostini are denied; and it is further

**ORDERED** that defendant Williams's motion to suppress post-arrest statements is denied; and it is further

**ORDERED** that, in connection with Rodriguez's motion to suppress post-arrest statements, the parties appear for a suppression hearing with the Court on Friday, November 9, 2001 at 10:00 a.m.; and it is further

**ORDERED** that defendant Marquez's motion to suppress post-arrest statements is denied; and it is further

**ORDERED** that defendant Santiago's motion to suppress physical evidence is denied; and it is further

**ORDERED** that defendant Santiago's motion to suppress eyewitness identification testimony is denied; and it is further

**ORDERED** that defendant Williams's motion for further discovery with respect to eyewitness identification procedures is granted, and the Government is directed to produce to Williams's counsel by Monday, November 5, 2001(1) a clearer copy of the photo array that resulted in Williams's identification and (2) details of the time and place where the identification occurred; and it is further

---

11. At oral argument, Guttierez joined in the 404(b) motion of his co-defendants and requested production of 404(b) evidence at least two weeks before trial and *Giglio* and 3500 material at least one week before trial. *See* Tr. at 46, 48.

**42**

ORDERED that defendant Baerga's motion to suppress the testimony of cooperating witnesses is denied; and it is further

ORDERED that the motions by defendants Santiago, Rodriguez and Baerga for a bill of particulars are denied; and it is further

ORDERED that defendant Rini's motion for a bill of particulars is granted, and the Government is directed to produce to Rini's counsel by Monday, November 5, 2001 a bill of particulars setting forth (1) how Rini is alleged to have participated in the narcotics conspiracy; (2) the approximate dates and times of that participation; and (3) the identities of any unindicted co-conspirators with whom Rini participated in the narcotics conspiracy that the Government intends to reference at trial; and it is further

ORDERED that the motions by defendants Rodriguez, Baerga and Marquez for additional discovery under Fed.R.Crim.P. 16 is granted to the extent that the Government has not yet satisfied its obligations thereunder; and it is further

ORDERED that the motions by defendants Marquez and Rini for pre-trial disclosure of the Government's witnesses are denied; and it is further

ORDERED that defendant Marquez's motion for pre-trial disclosure of the identities of the Government's confidential informants is denied; and it is further

ORDERED that the motions by defendants Marquez, Rini and Baerga for *Brady* material is denied; and it is further

ORDERED that the motions by defendants Marquez, Rini and Baerga and Guttierez for *Giglio*, and Jencks Act materials are denied, and the Government is directed to produce all such materials by the close of business on the Friday before the trial begins; and it is finally

ORDERED that the motions by defendants Marquez and Baerga for production of Fed.R.Evid. 404(b) material is granted, and the Government is directed to produce all Rule 404(b) evidence two weeks before trial.

SO ORDERED.